[No. C066705. Third Dist. July 18, 2012.]

Guardianship of the Persons and Estates of AVERY VAUGHAN et al., Minors.
PATTI-JEANNE STUART et al., Petitioners and Respondents, v.
ANN MARIE VAUGHAN, Objector and Respondent;
AVERY VAUGHAN et al., Appellants.

1056

COUNSEL

Beth A. Melvin, under appointment by the Court of Appeal, for Appellants.

No appearance for Petitioners and Respondents.

Ann Marie Vaughan, in pro. per., for Objector and Respondent.

OPINION

NICHOLSON, Acting P. J.—This appeal arises from the trial court's denial of a petition by appellants' grandparents for a probate guardianship over appellants. Family Code section 3041 prohibits a court from granting custody of a minor to a person who is not the child's parent and over the parent's objection without first finding that granting custody to the parent would be detrimental to the child and granting custody to the nonparent is required to serve the child's best interest. (Fam. Code, § 3041, subd. (a).) Detriment to the child must be supported by clear and convincing evidence. (Fam. Code, § 3041, subd. (b).)

However, Family Code section 3041 provides an alternative way to establish detriment to the child. Detriment to the child also includes the harm of removing the child from his "stable placement" with a person who has assumed, on a day-to-day basis, the role of the child's parent and has fulfilled the child's physical and psychological needs for care and affection, and has done so for a substantial period of time. (Fam. Code, § 3041, subd. (c).) If the court finds by a preponderance of the evidence that the person to whom custody may be given is such a person, that finding establishes a rebuttable presumption that custody of the child with that nonparent is in the child's best interest and that parental custody would be detrimental to the child. (Fam. Code, § 3041, subd. (d).)

In denying the grandparents' petition for guardianship of the children, that is, appellants, the trial court determined the grandparents did not qualify for the "stable placement" rebuttable presumption because appellants had not been abandoned to the grandparents, a prerequisite of the statute, according to the trial court. It also determined the grandparents did not show by clear and convincing evidence that custody with them was in appellants' best interest and custody with the parent would be detrimental.

Appellants claim the trial court's ruling is a misinterpretation of law, and its conclusion of no detriment an abuse of discretion. We agree the trial court has misinterpreted the stable placement provision, and we reverse and remand

on that basis. The stable placement provision of Family Code section 3041 is not dependent on the child first being abandoned with the nonparent.

## FACTS

### 1. *Family history*

Objector Ann Marie Vaughan and her former husband, Evan Vaughan, met as teens. They were together off and on for approximately six years prior to their marriage in 2006. During that time, two children, appellants here, were born to them; son Avery in 2003 and daughter Honey Bear in 2005. The family lived in many locations, including Weaverville and Hyampom in Trinity County, Humboldt County, and Hawaii. At times, they lived a hand-to-mouth existence, often living in a tent in the woods without visible means of support and with no electricity or modern conveniences. Evan suffers from bipolar disorder.

There is a significant history of domestic violence between Ann Marie and Evan. In 2006, Evan was convicted of misdemeanor cohabitant abuse. After his arrest for that crime, he and Ann Marie separated, then reconciled and married. Later that year, however, Evan was charged with more than 20 felony counts of kidnapping, spousal rape, and assault against Ann Marie, as well as child endangerment. Ann Marie claimed the children witnessed the attack.

Ann Marie filed for dissolution of marriage from Evan after the incident and moved to Humboldt County. She obtained sole legal and physical custody of the children. Over the next two years, she moved the family a number of times.

During 2007, she and the children participated in therapy with a licensed clinical social worker, Teri Vodden. Ann Marie sought the therapy, known as "Parent-Child Interaction Therapy" (PCIT), to address behavioral issues in Avery. Vodden also treated the children for posttraumatic stress caused by witnessing the violence ostensibly perpetrated by their father on their mother.

Also in 2007, Ann Marie was diagnosed as having posttraumatic stress disorder (PTSD) and affective personality disorder. It was also noted in her medical records that she had mild substance abuse problems. She chose not to undergo treatment for any of these problems.

While Ann Marie had sole custody of the children, Evan's mother and stepfather, petitioners Patti-Jeanne (hereafter Patti) and Mark Stuart, were granted supervised visitations with the children as part of the dissolution

proceeding. The visitations, however, were not consistent, in part because Ann Marie did not always take the children to the visits. Ann Marie grew increasingly distrustful of the Stuarts and their motives. She ultimately obtained a restraining order against them. She believed they were stalking her and the children, and that they had an unfavorable attitude towards her because of the criminal charges she raised against their son. She also was registered with a program of the California Secretary of State known as Safe at Home, through which she was applying to change her and the children's family name for safety reasons.

In early 2009, Evan was acquitted of all charges against him except for misdemeanor counts of assault and battery. The acquittal was very difficult for Ann Marie to accept. She became anxious and fearful, and she decided she needed help. On February 18, 2009, she checked herself into a mental health facility. But before doing so, she arranged through a friend of hers and coworkers of petitioner Patti Stuart to have Patti pick up the children. She thought she was going to need only a few days to feel better, and thus assumed Patti would have the children only for that time and then bring them back to her. Once the children were with the Stuarts, Ann Marie checked herself in.

The mental health center determined Ann Marie qualified for an involuntary hold under Welfare and Institutions Code section 5150, but she had gone there voluntarily and her stay was documented as such. She was diagnosed with PTSD and a major depressive disorder. However, she checked herself out of the facility the following day, February 19, 2009, against medical advice. Doctors were concerned because she had refused medication, she had a poor understanding of her illness, and she had not previously received psychiatric help or treatment.

But on the next day, February 20, she again checked herself in and was admitted as a "voluntary 5150." She tested positive for marijuana and an opiate. She admitted smoking marijuana, for which she had a doctor's recommendation, but denied taking an opiate. This time she was diagnosed with PTSD and panic disorder. At discharge, she accepted medication and agreed to seek ongoing treatment.

2. *Petition for guardianship*

Meanwhile, on February 19, 2009, the day after they received Avery and Honey Bear, the Stuarts filed a request for, and were granted, temporary custody of the children. On April 30, 2009, they filed petitions for guardianship and temporary guardianship. They alleged guardianship was necessary because both Ann Marie and Evan were unsuitable to be custodial parents.

They claimed Ann Marie "has untreated mental health needs that have led to violent mood swings, substance abuse, and cruelty toward the children." They also claimed Evan had a prolonged separation from the children due to his incarceration pending his trial, lack of means of support, and mental health difficulties which rendered him unsuitable as a custodial parent at that time. Ann Marie opposed the guardianship.

Temporary guardianship was granted on May 4, 2009. The matter next came up for hearing on June 11, 2009. The hearing was continued and held intermittently from then through May 24, 2010. During that time, the Stuarts maintained custody of the children as temporary guardians.

The court received testimony from Ann Marie and the Stuarts. The court also received oral and written testimony from court investigators and mediators, and court-appointed and private mental health professionals.

In her testimony, Ann Marie acknowledged she suffers from PTSD, and she admitted using marijuana pursuant to a medical recommendation to alleviate the symptoms of her disorder. She stated her disorder had no effect on her ability to care for her children. She also was actively in therapy.

Ann Marie stated Avery was having behavior problems when she separated from her husband. However, the PCIT therapy had been very effective, and Avery had become less aggressive with his sister and had developed a clearer idea of physical boundaries. Avery was very nice to Honey Bear, was a good big brother, and looked out for her.

Patti Stuart testified she has worked as a teacher for 21 years, the last 10 as a special education teacher. She stated the children were doing well in the Stuarts' care. Both children were involved in preschool and sports activities, and Avery had begun taking guitar lessons. Patti and her husband, Mark, were able to spend time with the children, as she had reduced her work schedule to three days a week and Mark worked only from August to October. He operated a water truck business for servicing wildfires.

Patti had concerns about Avery's behavior when he first moved into her home. Avery wanted to head-butt everybody and used his toys to kill. He also asked Mark and Patti to check on him every two minutes while he slept. These characteristics had subsided by the time of trial, and Avery seemed more comfortable.

Patti also noticed Avery constantly attempted to protect and physically care for his younger sister, Honey Bear. Patti referred to this as "parentification," something she had seen in her years of teaching. This behavior by Avery had

subsided somewhat, but he still felt it was his job to take care of Honey Bear and believed she was not safe unless he was taking care of her.

Patti stated that when Ann Marie asked her and Mark to take the children when she checked herself into a mental health facility in February 2009, she did not tell them how long she wanted them to care for the children. Patti said they "had no idea how long it would be." Patti described Ann Marie's request as a miracle, since Ann Marie had denied them visitation as much as possible over the preceding two years.

Mark Stuart testified at the hearing, and his testimony was consistent with his wife Patti's testimony.

Kathy Anthonijsz is a trial court investigator who investigated the Stuarts' petition for guardianship. She recommended the petition be granted. She voiced concern over Ann Marie's and Evan's emotional stability. Although Ann Marie appeared to be making progress, the children had just recently begun to feel safe and cared for in the custody of the Stuarts. The Stuarts had also been taking the children to therapy for several months, and to remove Avery from his therapist and community support system would likely be detrimental to his long-term emotional well-being. The children appeared healthy and happy, and the Stuarts interacted appropriately with them.

Sylvia Green, a court mediator in the dissolution proceeding between Ann Marie and Evan, recommended the children be placed in the care of the Stuarts. From her investigation, it appeared the Stuarts' focus had been the children's well-being. It was apparent to Green that Ann Marie had been traumatized in her life, and her judgment had been severely lacking. Her continual habit of moving from place to place, her inconsistent stability and her recent hospitalization all caused undue stress and disruption to the children. Ann Marie had, however, participated in supervised visitation since the Stuarts gained custody and by all reports demonstrated good parenting skills.

Carol Kramer, Ph.D., a clinical psychologist, was appointed by the court to assist in the custody determination. Kramer concluded it was in the children's best interest to remain in the care of the Stuarts. She diagnosed Ann Marie as having generalized anxiety disorder, PTSD, and obsessive compulsive personality disorder with histrionic and paranoid personality features. Many of these problems could be traced to Ann Marie's childhood, described by Kramer as a "fairly impoverished, psychologically, emotionally and materially, childhood."

Kramer testified that Avery suffered from "privation," that of not having had "safe, nurturing, supportive parenting." Privation explained Avery's

assertive and unsafe behavior. That this behavior had improved during the time he lived with the Stuarts suggested Avery responded well to the structure they provided.

Kramer explained her custody recommendation: "[G]iven that Avery particularly needs a fair amount of remedial, restorative kind of plotting, concerned, consistent action through mental health counseling, I believe that the children are better off with the paternal grandparents [(the Stuarts)]. And I'm in part believing that—according to the guidelines, I believe [Ann Marie] falls into the category of a person who is in very high conflict a portion of the time in interrelationships, particularly with the family."

Kramer stated if the children were returned to Ann Marie, "we would see a perpetuation of the kinds of issues that Avery displays at the moment." In her opinion, without a very tight structure around him, Avery would begin to display symptoms of conduct disorder by the age of eight to 10 years old.

When asked if her opinion would be different if there were a change of circumstances involving Ann Marie, Kramer said: "I have no doubt that [Ann Marie] is undeniably interested in these kids and that she loves them. So if there were a tight arrangement indicating that [Ann Marie] would pursue the type of mental health that would allow her to accept that coming out of her own childhood she has certain deficits in terms of structure and function, in terms of her personality, and she understood the ways in which that could impact her impact on other people, she came to understand some of that and she had some courses in parenting that would allow her to have the skills to be present, then I think that she could take care of the kids."

Deborah Klein is a Trinity County mental health clinician and the children's therapist while they stayed with the Stuarts. She recommended the children not be returned to the lifestyle from which they came. It was that lifestyle that was driving the children's emotional instability. Avery acted out in play therapy in a way that was rough and unsafe. He could not control himself so as not to risk harm to himself or others. In her opinion, this resulted from Avery not receiving proper discipline and care and not having his basic needs met since a very early age.

Avery also was in the habit of parenting Honey Bear, a behavior that occurred because no one else was being a parent. Klein believed Avery was responding to therapy, but it would be "a long process" to change behavior he had learned at a very early age.

David L. Wilson, Ph.D., a clinical psychologist, was appointed by the court to make an assessment of the proposed guardianship. He was selected

because he had no prior knowledge of any of the parties or of the dispute. His investigation was limited to reviewing the petition for guardianship and interviewing Ann Marie, the Stuarts, and the children.

In his written report, Wilson concluded there would be "some detriment" to the children if they were returned to Ann Marie at this time. Ann Marie has significant emotional and mental health problems associated with her PTSD that are likely to interfere with her ability to be fully present for her children and provide for their care. There are also indications she has longer standing personality disorder problems arising from her upbringing that make it difficult for her to establish and maintain stability in her life and provide a safe, secure, and nurturing environment for her children.

However, Wilson noted Ann Marie had been taking steps to put her life together. She was in individual therapy with marriage and family therapist Jennifer Merrill, she was awarded disability benefits that provide her with a minimum income, she had secured stable housing, and she was not involved in a relationship with a man. She also claimed she had quit using marijuana.

From this, Wilson concluded Ann Marie "has made substantial progress toward resolving her emotional and mental health problems. She is just not quite there yet." He proposed the matter be resolved through a family unification plan, instead of a guardianship, that would ultimately result in Ann Marie regaining custody of her children.

At the hearing, Wilson backed off his diagnosis somewhat. After writing his report, he spoke with Ann Marie's therapist, Jennifer Merrill. Merrill did not diagnose Ann Marie with personality disorder. Wilson said he would defer to Merrill's opinion, as she knew Ann Marie far better than he.

Nevertheless, Wilson continued to believe it would be detrimental to the children if they were returned to Ann Marie's custody. At the time he saw Ann Marie, she had not visited the children for two months. Such an abrupt change would not be good for the children. He also continued to believe she needed to work on her PTSD so she could better care for the children.

Wilson did not believe Ann Marie's disorder was equivalent to that found in "a child welfare case, where there is endangerment of the children by negligent [*sic*] or abuse or such as that, but more applied to the term 'detriment' in the sense of harm."

The court asked Wilson how many parents who are presently caring for their children were in a worse condition than Ann Marie. Wilson replied that based on his 30 years of experience serving on the welfare team in Shasta

County that staffs all cases of child neglect and abuse, Ann Marie had never really met that threshold that would come before his team to sustain a charge of neglect or abuse.

The court stated all parties would agree the children were better off and were thriving in the Stuarts' home. The real question before it, however, was whether there would be any harm to the children if they were returned to Ann Marie that day. Wilson said he would hope there would be an orderly transition, "[b]ut as far as would the children be in danger if returned to their mother, being neglected or abused, I don't think so."

### 3. *Trial court's decision*

By written judgment dated August 8, 2010, the trial court denied the Stuarts' petition for guardianship. It first determined the Stuarts did not qualify for guardianship under the "stable placement" provisions of Family Code section 3041, subdivision (c). It agreed the Stuarts had provided a stable environment and had assumed the role of parents on a day-to-day basis for a substantial period of time. However, it interpreted subdivision (c) as applying only when the parents abandon their children with family or friends for a lengthy period of time and then years later file an action to have the de facto parents return the children. The court ruled this was not such a case, and thus the Stuarts could not come within the meaning of subdivision (c).

The court next determined the Stuarts had not shown by clear and convincing evidence that returning the children to Ann Marie would be detrimental to them, part of the two-part showing required under Family Code section 3041 to grant custody to a nonparent when not proceeding under the stable placement provision. It did not give credence to Kramer's and Klein's testimony claiming there would be detriment, particularly to Avery, if the children were returned. It relied on Ann Marie's testimony and that of her friend that while Avery was in Ann Marie's custody, he did not exhibit the anxiety, parentification, or violent play reported by the experts and by the Stuarts, and that he was an age-appropriate young boy.

The court also relied on Wilson's opinion that, in essence, had this been a child protective services matter, there was not sufficient detriment to the children to justify removing them from Ann Marie. The court acknowledged that comparing the issues and standards between probate guardianships and dependency matters could be argued as comparing apples and oranges, but it nonetheless found "a certain appeal" to Wilson's opinion when viewing this matter as a dependency action.

The children appeal from the trial court's judgment. They argue the court abused its discretion by (1) determining the "stable placement" provision of

Family Code section 3041, subdivision (c), required a showing that the children had been abandoned to the Stuarts before it applied and (2) determining the lack of detriment to the children by relying on Ann Marie's fitness rather than harm to the children, on an unsubstantiated finding that Avery had no problem behaviors, and on Wilson's opinion that the level of detriment to the children if returned to Ann Marie did not rise to the level of detriment in a dependency case.

## DISCUSSION

## I

### *Standard of Review*

The resolution of a legal dispute involves three steps: (1) establishing the facts; (2) determining the applicable law; and (3) applying the law to the facts. (*Guardianship of L.V.* (2006) 136 Cal.App.4th 481, 487 [38 Cal.Rptr.3d 894].) "The first step, determining the relevant facts, is committed to the trier of the facts and is reviewed on appeal with deference to the factfinder's decision by applying the venerable substantial evidence test. [Citations.] We view the evidence in a light most favorable to the trial court's decision, resolving all conflicts in the evidence and drawing all reasonable inferences in support of that court's findings. [Citation.] In short, we review the evidence but do not weigh it; we defer to the trial court's findings to the extent they are supported by substantial evidence. [Citations.]" (*Ibid.*)

With respect to the second step in the resolution process, determining the applicable law, we independently review all issues of law raised by the parties. (*Guardianship of L.V., supra,* 136 Cal.App.4th at p. 488.)

The third step, applying the law to the facts, is reviewed in this circumstance under the deferential clearly erroneous standard of review. (*Guardianship of L.V., supra,* 136 Cal.App.4th at p. 488.) "The issue of custody is one committed to the discretion of the trial court. [Citations.] Only in an exceptional case, in which the record so strongly supported a party's claim to custody that a denial of that claim by the trial court would constitute an abuse of discretion may an appellate court itself decide who should be granted custody . . . ." (*In re B. G.* (1974) 11 Cal.3d 679, 699 [114 Cal.Rptr. 444, 523 P.2d 244]; see Fam. Code, § 3040, subd. (b).)

The children's first ground of appeal, challenging the trial court's interpretation of the stable placement provisions of Family Code section 3041, subdivision (c), although styled as an abuse of discretion argument, in fact raises an argument of law regarding the statute's interpretation. We take up that question de novo.

The second ground of appeal, challenging the court's determination of a lack of detriment if the children were returned to Ann Marie, is a challenge to the court's discretion. Because we reverse on the children's first ground of appeal, we need not reach the second.

II

*Interpretation and Application of Family Law Code Section 3041, Subdivision (c)*

The children argue the trial court erred as a matter of law when it determined the stable placement provisions of Family Code section 3041, subdivision (c), did not apply because Ann Marie had not abandoned the children to the Stuarts. They claim the court impermissibly imposed an objective criterion—abandonment of the children—on its decisionmaking process, contrary to the Legislature's expressed intent that courts exercise great flexibility in deciding custody matters. This, the children argue, led the court to rely on Ann Marie's intentions, instead of the children's best interest, to determine their custody.

We conclude the children are correct. The trial court misapplied the stable placement provisions of Family Code section 3041, subdivision (c). Whether the children were abandoned to the Stuarts was not a relevant consideration.

A. *Legal background*

 Before proceeding, we recite a recent discussion by our Supreme Court of the law dealing with probate guardianships. "This custodial arrangement originated in the law governing the administration of decedents' estates, but it has not been restricted to orphans. Long before the advent of the dependency statutes, probate guardianships were instituted when 'conditions [were] shown to be such, by reason of the mental and moral limitations or delinquency of parents, that to allow the child to continue in their custody would be to endanger [the child's] permanent welfare.' (*In re Imperatrice* (1920) 182 Cal. 355, 358 [188 P. 48].)[1] In such cases, courts recognized that the 'right of the parent [to custody] must give way, its preservation being of less importance than the health, safety, morals, and general welfare of the child.' (*Imperatrice*, at p. 358.)

---

[1] "See also *In re Lundberg* (1904) 143 Cal. 402, 411 [77 P. 156]; *In re Vance* (1891) 92 Cal. 195, 198 [28 P. 229]; Weisz & McCormick, *Abandon Probate Court for Abandoned Children: Combining Probate Guardianship of the Person and Dependency into One Stronger, Fairer Children's Court* (2003) 12 S. Cal. Rev. L. & Women's Stud. 191, 194–195 (hereafter Weisz & McCormick)."

■ "After the passage of the juvenile dependency statutes, probate guardianships have continued to provide an alternative placement for children who cannot safely remain with their parents. (See Weisz & McCormick, *supra*, 12 S. Cal. Rev. L. & Women's Stud. at pp. 195–196.) The differences between probate guardianships and dependency proceedings are significant. (*Id.* at pp. 195–197.) Probate guardianships are not initiated by the state, but by private parties, typically family members. They do not entail proof of specific statutory grounds demonstrating substantial risk of harm to the child, as is required in dependency proceedings. (See Welf. & Inst. Code, § 300; *Guardianship of Stephen G.* (1995) 40 Cal.App.4th 1418, 1429–1430 [47 Cal.Rptr.2d 409].) Unlike dependency cases, they are not regularly supervised by the court and a social services agency. No governmental entity is a party to the proceedings. It is the family members and the guardians who determine, with court approval, whether a guardianship is established, and thereafter whether parent and child will be reunited, or the guardianship continued, or an adoption sought under [Probate Code] section 1516.5.

■ " 'A relative or other person on behalf of the minor, or the minor if 12 years of age or older, may file a petition for the appointment of a guardian . . . .' (Prob. Code, § 1510, subd. (a).) The probate court may appoint a guardian 'if it appears necessary or convenient.' (Prob. Code, § 1514, subd. (a).) [Fn. omitted.] An investigation into the circumstances of the proposed guardianship may be conducted, though the court may waive the investigation. (Prob. Code, § 1513, subd. (a).) [Fn. omitted.] A probate guardianship is often established with parental consent . . . . [Citations.] A parent who objects to guardianship is entitled to notice and a hearing. (Prob. Code, § 1511.)

■ "Early authorities held that in contested guardianship cases, parents were entitled to retain custody unless affirmatively found unfit. (14 Witkin, Summary of Cal. Law (10th ed. 2005) Wills and Probate, § 928, pp. 1031–1032, citing cases.) However, the unfitness standard fell out of favor and the best interest of the child, as determined under the custody statutes, became the controlling consideration. (*In re B. G.*[, *supra*,] 11 Cal.3d 679, 694–698 . . . ; *Guardianship of Marino* (1973) 30 Cal.App.3d 952, 957–958 [106 Cal.Rptr. 655].) The Probate Code now specifies that the appointment of a guardian is governed by the Family Code chapters beginning with sections 3020 and 3040. (Prob. Code, § 1514, subd. (b).)

"Family Code section 3020, subdivision (a) declares that 'the health, safety, and welfare of children shall be the court's primary concern in determining the best interest of children when making any orders regarding the physical or legal custody or visitation of children.' Under Family Code

section 3040, subdivision (a), parents are first in the order of preference for a grant of custody, but 'the court and the family' are allowed 'the widest discretion to choose a parenting plan that is in the best interest of the child.' (Fam. Code, § 3040, subd. (b).) Before granting custody to a nonparent over parental objection, the court must find 'clear and convincing evidence' that [(1)] 'granting custody to a parent would be detrimental to the child and that [(2)] granting custody to the nonparent is required to serve the best interest of the child.' (Fam. Code, § 3041, subds. (b), (a).)

■ "In 2002, the Legislature added subdivisions to Family Code section 3041 emphasizing the importance of a stable home environment for the child. (Stats. 2002, ch. 1118, § 3.) It specified that ' "detriment to the child" includes the harm of removal from a stable placement of a child with a person who has assumed, on a day-to-day basis, the role of his or her parent, fulfilling both the child's physical needs and the child's psychological needs for care and affection, and who has assumed that role for a substantial period of time. A finding of detriment does not require any finding of unfitness of the parents.' (Fam. Code, § 3041, subd. (c).) And, 'if the court finds by a preponderance of the evidence that the person to whom custody may be given is a person described in subdivision (c), this finding shall constitute a finding that the custody is in the best interest of the child and that parental custody would be detrimental to the child absent a showing by a preponderance of the evidence to the contrary.' (Fam. Code, § 3041, subd. (d).) Thus, the Legislature has determined that the critical finding of detriment to the child does not necessarily turn on parental unfitness. It may be based on the prospect that a successful, established custodial arrangement would be disrupted. (See *Guardianship of L.V., supra*, 136 Cal.App.4th at p. 491.)" (*Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1121–1123 [90 Cal.Rptr.3d 701, 202 P.3d 1089].)

"Thus, under [Family Code] section 3041, subdivision (d), a showing of de facto parent status creates a rebuttable presumption that it would be detrimental to place the child in the custody of a parent and the best interest of the child requires nonparental custody. As explained in *Guardianship of L.V.*[, *supra*,] 136 Cal.App.4th 481, 491 . . . , [Family Code] section 3041, subdivision (d) reflects a legislative assessment that ' "continuity and stability in a child's life most certainly count for something" ' and 'in the absence of proof to the contrary, removing a child from what has been a stable, continuous, and successful placement is detrimental to the child.' " (*H.S. v. N.S.* (2009) 173 Cal.App.4th 1131, 1137–1138 [93 Cal.Rptr.3d 470].)

B. *Analysis*

Here, the trial court determined the Stuarts were not persons within the meaning of Family Code section 3041, subdivision (c) because the children

had not been abandoned to them. The court acknowledged the Stuarts had provided the children a stable environment and had assumed the role of parents on a day-to-day basis for a substantial period of time. Nevertheless, the court determined the Stuarts did not come within the meaning of subdivision (c) because the evidence indicated Ann Marie had intended for the Stuarts to provide limited, short-term care of the children while she obtained emergency mental health treatment, and the Stuarts had assumed custody thereafter only over Ann Marie's objection. According to the court, it was clear Ann Marie wanted her children back.

In such a circumstance, the court wrote, Family Code section 3041, subdivision (c) did not apply because "for practical reasons and as a matter of public policy the Legislature, in its wisdom, added subsection (c) to handle those cases where a parent, or both parents, leave (read 'abandon') children with family or friends for a lengthy period of time and then, perhaps years later, bring an action to have the de facto parents give the children back."

The trial court's error in analysis is telegraphed by its attempt to insinuate abandonment into the text of subdivision (c) of Family Code 3041. Even a cursory review of Family Code section 3041, subdivision (c) establishes it is expressly unnecessary for the child to be left or abandoned before the statutory presumption is triggered.

■ "The rules governing statutory construction are well settled. We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citations.] 'In determining intent, we look first to the language of the statute, giving effect to its "plain meaning." ' [Citations.] Although we may properly rely on extrinsic aids, we should first turn to the words of the statute to determine the intent of the Legislature. [Citation.] Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. [Citation.]" (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].)

■ Our review confirms the trial court added a condition that is not supported by the statutory language. Nothing in the language of Family Code section 3041, subdivision (c), conditions the finding of a stable placement on whether the child had been left or abandoned by a parent who had no immediate intent to reclaim the child. As quoted above, the rebuttable presumption is established upon finding the child would be removed from "a stable placement" "with a person who has assumed, on a day-to-day basis, the role of his or her parent, fulfilling both the child's physical needs and the child's psychological needs for care and affection, and who has assumed that role for a substantial period of time." Nothing in the statute requires the "placement" to have been the result of abandonment.

Family Code section 3041, subdivision (c), "is a codification of the de facto parent doctrine, which grants standing [in dependency actions] to persons who . . . have come to function as parent to a child, even though not the child's natural parent. (*In re Kieshia E.* (1993) 6 Cal.4th 68, 70–71 [23 Cal.Rptr.2d 775, 859 P.2d 1290].)" (*Erika K. v. Brett D.* (2008) 161 Cal.App.4th 1259, 1267 [75 Cal.Rptr.3d 152].) The doctrine recognizes the interest a person acquires "in time" in the care and custody of a child by raising the child in his own home. (*In re B. G., supra,* 11 Cal.3d at p. 692.)

■ There is nothing in the de facto parent doctrine that conditions its establishment on the biological parent abandoning the child to the de facto parent. As a matter of fact, dependency de facto parent status assumes custody was initially granted over at least one parent's objection. Whether de facto parenthood exists is not based on the intentions of the biological parent or the manner in which the de facto parent gained custody. Rather, it is based on the quality of the relationship between the child and the de facto parent. (*Christina K. v. Superior Court* (1986) 184 Cal.App.3d 1463, 1467 [229 Cal.Rptr. 564].) The law does not impose an additional precondition on the doctrine's operation in the context of probate guardianships.

In any event, Ann Marie's intentions to regain her children came to have little relevance in this case. Immediately after giving her children to the Stuarts, their placement became one of court order. The trial court first granted temporary custody to the Stuarts, and then, less than three months later, it appointed the Stuarts as temporary guardians of the children. At that point, custody with the Stuarts was based on a judicial determination of good cause and the children's best interest. (Prob. Code, § 2250, subd. (b).)

As the matter continued, time progressed and the status quo changed. By the time the court ruled on the petition for guardianship, the Stuarts had served as temporary guardians for some 15 months. By then, according to the language of Family Code section 3041, the only issues before the court were whether, based on the children's current status, returning the children to Ann Marie's custody would be detrimental to them and whether leaving them in the custody of the Stuarts would be in their best interest. Nothing in those issues concerned Ann Marie's original intentions, and the court erred in considering them.

■ The trial court found by a preponderance of the evidence the Stuarts had assumed the role of parents on a day-to-day basis, had done so for a substantial period of time, and had fulfilled the children's physical and psychological needs for care and affection. These findings established the rebuttable presumption provided by Family Code section 3041, subdivisions (c) and (d), and the court had no discretion to impose any additional qualifications for establishing the presumption.

Upon making these findings, the court was obligated to determine whether Ann Marie had rebutted the presumption by showing by a preponderance of the evidence that custody with the Stuarts was not in the best interest of the children and that custody with her would not be detrimental to them. The trial court did not do this.

Because the trial court did not follow the procedure required by Family Code section 3041, subdivisions (c) and (d), we must reverse the judgment and remand the matter for the trial court to finish complying with that procedure. The record reflects that the evidence established the stable placement presumption during the trial court proceedings. Thus, on remand, Ann Marie is entitled to a hearing to present evidence to rebut the stable placement presumption: namely, evidence establishing that (1) custody with the Stuarts is not in the children's best interest, and/or (2) custody with her would not be detrimental to the children. Because the issue of custody necessarily requires consideration of current circumstances, and those circumstances are unknown to us and the trial court, Ann Marie is not limited to the evidence in this record.

If the court, following the hearing, determines Ann Marie has established by a preponderance of the evidence (1) custody with the Stuarts is not in the children's best interest, or (2) returning the children to Ann Marie would not be detrimental, then the stable placement presumption is rebutted and the court must determine the petition for guardianship pursuant to Family Code section 3041, subdivisions (a) and (b). Under those provisions, the court must find by clear and convincing evidence that (1) custody with the Stuarts is in the children's best interest, and (2) returning the children to Ann Marie's custody would be detrimental to them, before the court may grant the petition for guardianship. Again, because determining custody requires considering current circumstances, the parties are not limited to the evidence in this record should the trial court be required to resolve the petition for guardianship pursuant to Family Code section 3041, subdivisions (a) and (b).

If any party on remand alleges Ann Marie is unfit as defined by section 300 of the Welfare and Institutions Code, the court shall comply with the requirements of section 1513, subdivision (c), of the Probate Code. (*Guardianship of Christian G.* (2011) 195 Cal.App.4th 581, 602–607 [124 Cal.Rptr.3d 642].)

If, however, Ann Marie cannot by a preponderance of the evidence overcome the stable placement presumption, then the court under Family Code section 3041, subdivision (d), must make the findings necessary to grant the petition for guardianship.

Because we reverse on this basis, we need not reach the children's remaining argument.

Also, in the interest of justice, we order all further proceedings in this matter be heard before a trial judge other than the judge whose judgment we have here reviewed. (Code Civ. Proc., § 170.1, subd. (c).)

Furthermore, we order custody of the children remain with Ann Marie unless the trial court orders otherwise.

## DISPOSITION

The judgment is reversed and the case remanded to a trial judge other than the judge whose judgment we have here reviewed for further proceedings consistent with this opinion. Costs on appeal are awarded to the children. (Cal. Rules of Court, rule 8.278(a).)

Butz, J., and Duarte, J., concurred.

A petition for a rehearing was denied August 16, 2012, and the opinion was modified to read as printed above.