Filed 7/23/14

CERTIFIED FOR PUBLICATION

**COPY**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| Guardianship of A.L. et al., Minors. | C074384 |
| JENNIFER L. et al., | (Super. Ct. No. 06PR01033) |
| Petitioners and Respondents, | |
| v. | |
| MARJORIE L., | |
| Objector and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Peter J. McBrien, Judge. Reversed.

Law Offices of Stephanie J. Finelli and Stephanie J. Finelli; Brian Briggs for Objector and Appellant.

No appearance for Petitioners and Respondents.

1

Seven years after appellant Marjorie L. (the guardian or Marjorie) was appointed guardian of her two granddaughters, A.L. and E.L. (the minors), the trial court granted a petition to terminate the guardianship filed by the minors' parents, respondents Jennifer L. and Richard L., Jr., (the parents, or Jennifer and Richard), following a minutes long hearing in which no evidence was introduced, no witness testimony was taken, and no arguments from counsel were heard.  Such a truncated process deprived the guardian of any meaningful hearing or opportunity to object to the petition, and prevented the court from fully considering whether termination was in the best interests of the minors-- the paramount concern in cases of this nature.  We therefore reverse the order terminating the guardianship and remand for an evidentiary hearing before a different judge to consider whether termination is in the minors' best interests.  We express no opinion on the merits of the petition itself.

FACTS AND PROCEEDINGS

A.     *Family History*

The parents have had a tumultuous relationship fraught with drug abuse, domestic violence, financial hardship, and criminal convictions.  They began dating around 1999 following Jennifer's divorce from her first husband who supplied her with drugs. Jennifer was convicted of prostitution in 2006 and theft in 2007, and Richard was convicted for failure to appear on a written promise in 2002.

The parents married in 2008 and have four children together.  The oldest, A.L., was born in June 2002.  A son, I.L., followed in May 2004.  E.L. was born next in July 2005.  Their fourth child, O.L., was born in July 2008.

As noted, the parents have a lengthy history of drug abuse.  Jennifer began using methamphetamine when she was 15.  She continued abusing the drug for approximately 15 years, and evidence in the record suggests she used drugs while pregnant with I.L. After achieving what turned out to be temporary sobriety around the age of 30, she

2

relapsed in 2011, a year before filing the petition to terminate the guardianship. Richard also began using methamphetamine as a teen. He abused the drug for over 20 years, from the age of 16 until approximately the age of 40 when he enlisted in the Army in 2007.

Child Protective Services (CPS) received at least 11 referrals regarding the parents, four of which were substantiated for an absent or incapacitated caretaker, substantial risk or general neglect. To avoid having A.L. and I.L. removed by CPS in August 2004, Richard asked his stepsister, Shannon, to care for the children. Shannon lived with her minor children in a house on the property of Richard, Sr., Richard's father and her stepfather. In early 2005, A.L. returned to live with the parents but I.L. remained with Shannon. In January 2006, Richard asked Shannon to care for A.L. and also for E.L., who had since been born. Because she was already caring for her own children and I.L., Shannon declined. Richard and Jennifer then approached Marjorie, Richard's mother, for help with the minors since Richard had lost his job and they were losing their home.

## B. *Guardianship of the Minors*

With the parents' consent, Marjorie petitioned the Sacramento County Superior Court for guardianship of A.L. and E.L. Among other things, the parents' drug use and financial difficulties were cited as bases for the guardianship. The court granted the petition in August 2006. In a separate case, Richard, Sr., petitioned for and was granted guardianship of I.L.

## C. *Living Arrangements*

Throughout the seven-year guardianship, the minors periodically lived with the parents. Beginning in January 2008, A.L. moved to Kentucky where Richard was stationed in the Army to live with the parents. Because Jennifer was pregnant with O.L. at the time, the guardian and the parents agreed E.L. would stay with her until O.L.'s birth. O.L. was born with severe health issues so the guardian and the parents agreed

3

E.L. would remain in California with her until his health issues improved. E.L. eventually moved to Kentucky with her parents around August 2009. Richard was then transferred to Virginia and the parents, the minors, and O.L. relocated; I.L. remained in California with Richard, Sr., and Shannon, and did not join the rest of the family in Virginia until approximately January 2010.

In February 2010, Richard was deployed to Afghanistan. During his year-long deployment, Jennifer and the children moved into a house on Richard, Sr.,'s property in California. While the parents maintain that Jennifer cared for the children during this time, Shannon claims she was the children's primary care-giver between February 2010 and March 2011 because Jennifer was abusing prescription and illegal drugs and had difficulty caring for the children.

Richard returned from Afghanistan in late February 2011. Upon his return, he discovered Jennifer had been having a sexual relationship with an ex-boyfriend who was a drug dealer. The parents got into a domestic dispute over the affair and Jennifer assaulted Richard. Jennifer also inexplicably injured her foot that same day, although the parents deny the injury was related to domestic abuse. The next day, Richard's stepmother reported the incident to police, and Jennifer was arrested for domestic violence. Jennifer was jailed for a few days, but the charges ultimately were dismissed.

Due to a restraining order obtained by Richard or his family members, Jennifer did not return to the property after being released from jail and her whereabouts were unknown. Jennifer later admitted to staying with her ex-boyfriend, with whom she had had the affair, and using methamphetamine at least twice while with him. After Jennifer left, Shannon found a methamphetamine pipe in Jennifer's room and e-mails indicating Jennifer had allowed O.L. to spend time with her and the ex-boyfriend.

A few days after Jennifer's arrest, Richard returned to his Army duties in Virginia and left all four children in California with his family. Prior to leaving, he helped his father obtain guardianship of O.L. Thus, as of March 2011, the minors and their two

4

siblings lived with Shannon on Richard, Sr.,'s property without either Jennifer or Richard and all four children were under guardianship at that time. The guardian consented to the arrangement in order to keep all the siblings together and because the children were thriving under Shannon's care.

Several months later, Jennifer and Richard reconciled. According to the parents, Richard's family was displeased with the reconciliation and made it difficult to have regular contact with the children. From March 2011 to May 2012, Richard saw the children once at Christmas. Jennifer did not see them at all. The parents, however, did speak with the children over the phone.

## D.    *Petition to Terminate Guardianship*

In May 2012, the parents petitioned the court to terminate guardianship of the minors. The parents each submitted declarations supporting the petition together with letters from friends and parenting and anger management class certificates for Jennifer. Neither declaration mentioned their history of drug use nor Jennifer's drug relapse in 2011; they described Jennifer's extramarital affair with her ex-boyfriend who dealt drugs as a "friendship" and characterized their physical altercation after Richard discovered the affair as a simple slap.

A probate court investigator interviewed the parents, the minors, the guardian, Richard, Sr., and Shannon in connection with the petition. Citing, among other things, the parents' history of domestic violence and Jennifer's recent drug relapse, which she failed to mention in her declaration, the investigator did not support terminating the guardianship. The investigator expressed serious concerns about separating the minors from their siblings and removing them from a familiar environment where they had been living for the past two years. The investigator's report specifically stated the minors' guardian and Richard, Sr., the guardian of the minors' siblings, objected to terminating

5

the guardianship of A.L. and E.L. The investigator recommended the court order mediation or set the matter for trial.

The guardian and Shannon each filed declarations opposing the petition. The declarations generally discussed the circumstances giving rise to the guardianship, the parents' volatile relationship and drug use, and unsuccessful efforts to reunite the family. The guardian believed it was in the minors' best interest to remain in California with their siblings and Shannon because the children were thriving in that environment.

In November 2012, the court appointed an attorney for the minors and continued the hearing on the petition to February 2013. Shortly after being appointed, the minors' counsel interviewed the parents, spoke with the guardian, and met with the minors. Although the minors had not seen their parents in nearly two years and unbeknownst to the guardian, the minors' attorney arranged to have the parents meet with the girls at her office without the guardian or a family therapist present. Based on these interviews, the attorney for the minors recommended suspending the guardianship and immediately returning the minors to the parents subject to a six-month status review as well as other terms and conditions. Although the minors' attorney met with the parties in November 2012, she did not file or serve her report until June 3, 2013.

At the continued hearing in February, the court ordered the Department of Social Services in Virginia or the military equivalent to conduct a home study of the parents' home and to file a written report detailing its findings prior to the next scheduled hearing in June 2013. Although not clear from the record, it appears the minors' counsel was given the task of requesting the Virginia home study. The court also ordered Jennifer to undergo monthly drug testing, to submit the results prior to the June hearing, and further ordered the parties to mediation.

The parties mediated the dispute in March 2013. A court mediator met with the parents, the guardian, and the minors but refused Shannon's request, as the minors' day-to-day caregiver, to participate in the mediation. The mediator also did not interview

6

Richard, Sr., even though the minors had been living on his property for the previous two years. The mediator recommended terminating the guardianship and believed Richard's family was unnecessarily restricting the parents' access to the minors.

While the mediation occurred in early March 2013, the mediator did not complete her report until May 31, 2013, six days before the June 6 hearing on the petition. The guardian's counsel did not actually receive a copy of the mediation report until June 3, three days before the scheduled hearing. Similarly, on June 3 the guardian's counsel received a copy of the minors' counsel's report recommending the guardianship be suspended and the children immediately be returned to their parents' custody. Because the reports were served only three days before the hearing, the guardian's counsel requested that opposing counsel stipulate to continue the hearing to allow the guardian time to respond to the newly filed reports. After initially agreeing to a continuance, the parents' counsel later refused to stipulate as did the minor's counsel.

E.      *Hearing on the Petition to Terminate Guardianship*

On June 6, 2013, the day of the hearing, the court called the matter a few minutes after 9:00 a.m. The guardian was waiting in the hallway for her counsel, who was running late due to a traffic accident. Before the minors' counsel could even make it to counsel table to state her appearance, and without receiving any evidence or hearing any witness testimony, the court announced it was terminating the guardianship. It did so even though the Virginia State Department of Social Services never conducted a home study of the parents' home as previously ordered by the court.

The minors' counsel then verified the court was terminating rather than suspending the guardianship. After confirming he was terminating the guardianship, the court asked if there were any objections. Despite the previous written objections from the guardian, Shannon, and the court investigator, the court terminated the guardianship when neither the minors' counsel nor the parents' counsel objected.

7

The guardian's counsel arrived a few minutes later without a suit jacket. He persuaded the judge to recall the matter and asked for a continuance and an opportunity to respond to the newly filed reports. The court questioned what, if anything, the guardian's counsel could say to change his mind. In response, counsel stated that neither the mediator nor the minors' counsel had spoken with Shannon or Richard, Sr., the minors' primary caretakers, and that the court investigator, who did speak with them, recommended against terminating the guardianship.

The court ultimately denied the request for a continuance and an opportunity to respond to the reports, stating that had counsel really been prepared he would have worn a suit jacket. Besides relieving minors' counsel and ordering Richard to pay a $640 assessment, the order terminating the guardianship states only that the petition is granted; it contains no factual findings that the termination is in the minors' best interest nor does it impose any of the conditions recommended by the mediator or the minors' counsel. The minors were immediately transferred to their parents' custody and moved to Virginia.

*F.    Motion to Set Aside Order Terminating Guardianship*

Both the guardian and Shannon filed ex parte motions to set aside the order terminating the guardianship. The motions were denied on an ex parte basis and were set for hearing on August 7, 2013. Because her deadline for appealing would have expired prior to receiving a ruling on the motion to set aside the order, the guardian filed a timely notice of appeal. In light of the appeal, the trial court stayed the motions without ruling on the merits.

In August 2013, we denied the guardian's petition for a writ of supersedeas, but later granted her motion for calendar preference. We received no response from the parents following the filing of the guardian's opening brief on the merits.

8

**DISCUSSION**

**I.**

*Section 1601 Requires an Evidentiary Hearing Prior to Terminating a Probate Guardianship*

The guardian contends the trial court was required to conduct a full evidentiary hearing before terminating the guardianship and awarding custody of the minors to the parents. We agree.

Probate Code section 1601 governs the termination of probate guardianships. (Prob. Code, § 1601; further undesignated section references are to the Probate Code.) Section 1601 provides, "Upon petition of the guardian, a parent, the ward, or, in the case of an Indian child custody proceeding, an Indian custodian or the ward's tribe, the court may make an order terminating the guardianship if the court determines that it is in the ward's best interest to terminate the guardianship. Notice of the hearing on the petition shall be given for the period and in the manner provided in Chapter 3 (commencing with Section 1460) of Part 1." (§ 1601.)

The current appeal requires us to construe the language of Section 1601. We must decide whether the term "hearing" as used in the statute necessarily encompasses a judicial proceeding where the parties are afforded an adequate opportunity to present evidence on disputed factual issues before the court decides whether to terminate a probate guardianship based on such evidence. We conclude that it does.

"The rules governing statutory construction are well settled." (*Guardianship of Vaughan* (2012) 207 Cal.App.4th 1055, 1071 (*Vaughan*).) When interpreting a statute, courts must ascertain the Legislature's intent so as to effectuate the law's purpose. (*Young v. McCoy* (2007) 147 Cal.App.4th 1078, 1083 (*Young*).) In determining this intent, we first consider the words of the statute, being careful to give them their usual, ordinary meaning. (*People v. Carron* (1995) 37 Cal.App.4th 1230, 1236 (*Carron*).) If an

9

ambiguity exists, "we may consider a variety of extrinsic aides, including legislative history, the statute's purpose, and public policy" when construing the statute. (*People v. Franco* (2009) 180 Cal.App.4th 713, 721 (*Franco*).)

We do not consider statutory language in isolation. (*Franco, supra,* 180 Cal.App.4th at p. 720.) Instead, we consider a statute's entire substance to determine the scope and purpose of the provision. (*Id.* at p. 721.) "That is, we construe the words in question ' "in context, keeping in mind the nature and obvious purpose of the statute. . . ." ' [Citation.]" (*Id.* at p. 721.) " ' "Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole." ' " (*Young, supra,* 147 Cal.App.4th at p. 1083.) With these principles in mind, we turn to the statute's plain language.

Although section 1601 refers to a "hearing on the petition," the statute does not explicitly define the meaning of the word "hearing." Some courts have recognized that the term is "generally understood to be a proceeding where evidence is taken to the end of determining an issue of fact and a decision made on the basis of that evidence." (See e.g., *People v. Pennington* (1967) 66 Cal.2d 508, 521 [reversal required where defendant erroneously denied full hearing on sanity issue under Penal Code section 1368] (*Pennington*); *People v. Ivenditti* (1969) 276 Cal.App.2d 178, 179 [hearing under Welfare and Institutions Code section 3100 et seq. took place even though counsel dispensed with calling witnesses where court drew its findings and conclusions based on evidence in form of reports received by stipulation] (*Ivenditti*).) Other courts, however, have determined that the word "hearing" does not necessarily require an opportunity for an oral presentation unless the context otherwise requires. (*Lewis v. Superior Court* (1999) 19 Cal.4th 1232, 1247-1249 [oral argument not required before an appellate court may issue a peremptory writ of mandate or prohibition in the first instance]; *Schlessinger v. Rosenfeld, Meyer & Susman* (1995) 40 Cal.App.4th 1096, 1105 [an arbitrator's duty to

10

"hear" evidence under Code of Civil Procedure section 1286.2, subdivision (e), does not require the oral presentation of evidence or live testimony].)

Regardless of whether the plain meaning of the word "hearing" is discernible, the context of section 1601, the underlying purpose of the probate guardianship statutes, the magnitude of the interests at stake, and the fundamental nature of the factual issue involved indicate that section 1601 requires an evidentiary hearing prior to terminating a probate guardianship. *Harbour Vista, LLC v. HSBC Mortgage Services, Inc.* (2011) 201 Cal.App.4th 1496, 1507 [court analyzes context and entire statutory scheme when deciphering meaning of imprecise terms such as "heard" and "hearing"] (*Harbour Vista*); (*Franco, supra,* 180 Cal.App.4th at p. 721 [court is mindful of nature and purpose of statute when construing statute's words within the framework of the entire statutory scheme].)

Historically, probate guardianships were instituted when " ' " conditions [were] shown to be such, by reason of the mental and moral limitations or delinquency of parents, that to allow the child to continue in their custody would be to endanger [the child's] permanent welfare." ' " (*Vaughan, supra,* 207 Cal.App.4th at p. 1068.)  In such cases, courts recognized the " ' "right of the parent [to custody] must give way, its preservation being of less importance than the health, safety, morals, and general welfare of the child." ' " (*Ibid.*)  The probate guardianship statutes are thus intended to ensure and protect the welfare of a minor who ordinarily cannot protect himself.

This laudable purpose is evident in the standards for appointing a probate guardian, and later, in terminating any such guardianship.  A court may appoint a guardian if it is in the child's best interest as determined under family law custody statutes, particularly Family Code section 3020 and 3040 et. seq.  (§ 1514, subd. (b).) Family Code section 3020, subdivision (a), provides "the health, safety, and welfare of children shall be the court's primary concern in determining the best interest of children when making any orders regarding the physical or legal custody or visitation of children."

11

(Fam. Code, § 3020, subd. (a).) Under Family Code section 3041, which governs contested guardianship appointment proceedings, parents are first in the order of preference for a grant of custody, but a showing of de facto parent status by a nonparent creates a rebuttable presumption that it would be detrimental to place the child in the custody of a parent and the best interest of the child requires nonparental custody. (Fam. Code, §§ 3041, subds. (a), (c), (d).)

The best interest of the child is the sole criterion governing guardianship termination proceedings. (*In re Guardianship of L.V.* (2006) 136 Cal.App.4th 481, 490 [ward's best interest is only criterion for determining whether to terminate a probate guardianship] (*Guardianship of L.V.*); § 1601.) The fitness of a parent to assume custody is not a controlling consideration. (*Guardianship of L.V.* at pp. 488-491 [termination of guardianship was not in the best interest of a child even though parents could provide basic food, clothing, and shelter].)

What constitutes the best interest of a child presents an inherently factual issue. (*In re Guardianship of Olivia J.* (2000) 84 Cal.App.4th 1146, 1159-1161 [whether parental custody is detrimental to minor or whether award of custody to nonparent is required to serve child's best interests are factual questions].) As this court has recognized, this is "an inquiry that is particularly founded on application of the trial court's experience with human conduct." (*Guardianship of L.V., supra,* 136 Cal.App.4th at p. 488.) Where a court acts as a fact finder resolving matters of considerable significance to the parties, such as the best interest of a minor, a full evidentiary hearing is warranted before the decision can properly be made. (*Harbour Vista, supra,* 201 Cal.App.4th at pp. 1507-1508 [discussing circumstances where an evidentiary hearing and oral argument is required, including quiet title actions and summary judgment motions].)

Bolstering this conclusion is the fact that a trial court's decision terminating a probate guardianship ultimately involves the custody of a minor. "Under the Constitution

of this state the judicial power to award the custody of children is vested in the courts alone, and in the exercise of that power the law requires a full hearing and a decision on the evidence produced under oath or upon the stipulation of the parties." (*Washburn v. Washburn* (1942) 49 Cal.App.2d 581, 589 [child custody dispute following divorce decree].) As the guardian points out, various family law custody statutes also require an evidentiary hearing or trial before custody may be awarded to a parent or nonparent. (See e.g., Fam. Code, §§ 3023 ["If there is more than one contested issue and one of the issues is the custody of a minor child, the court, as to the issue of custody, shall order a separate trial."], 3040, subd. (c), 3041, subd. (a) ["Allegations that parental custody would be detrimental to the child, other than a statement of that ultimate fact, shall not appear in the pleadings. The court may, in its discretion, exclude the public from the hearing on this issue."].) Considering section 1601 within this larger statutory framework reinforces the need for an evidentiary hearing before a probate guardianship is terminated.

Finally, case law construing section 1601 supports our conclusion that section 1601 requires an evidentiary hearing before a court may terminate a probate guardianship. For example, in *Guardianship of Simpson* (1998) 67 Cal.App.4th 917, 920-921, the court held a trial during which evidence was presented and witness testimony was taken on whether a voluntary probate guardianship should be terminated and the children returned to their father. The court held the father bore the burden of proving by a preponderance of the evidence that his overall fitness was sufficient to overcome the inherent trauma of removing the children's successful and long-term caregiver. (*Id.* at p. 933.) Likewise, in *Guardianship of L.V.*, the court held an evidentiary hearing on a petition to terminate a probate guardianship before denying the petition as not in the best interest of the child based on the evidence presented during the hearing. (*Guardianship of L.V., supra,* 136 Cal.App.4th at pp. 485-487.) These cases demonstrate that an evidentiary hearing is necessary before a trial court can resolve the important factual issue of what is in a child's best interest.

Given section 1601's context, the underlying purpose of the probate guardianship statutes, the magnitude of the interests at stake, and the fundamental factual issue involved--a child's best interest, including his health, safety, and welfare--we conclude section 1601 requires an evidentiary hearing before a trial court may terminate a probate guardianship. Parties to a contested petition to terminate a guardianship, like the guardian here, should have the opportunity to present relevant evidence to the trial court at a hearing grounded in due process and the trial court has a duty to consider and pass upon the evidence presented in such a proceeding. (*Guardianship of L.V., supra,* 136 Cal.App.4th at p. 500.)

## II

### *The Trial Court Failed to Conduct an Evidentiary Hearing Under Section 1601*

Having concluded section 1601 requires an evidentiary hearing before a trial court may terminate a probate guardianship, we next turn to the issue of whether such a hearing occurred in this case. Based on the record before us, we cannot say that it did.

While it is true a hearing was set on the parents' petition to terminate, the record plainly demonstrates no evidentiary hearing occurred. The court did not take any additional evidence or elicit any testimony from witnesses at the hearing. And, according to the minors' counsel, the judge announced its ruling on the petition before she could even say anything. Indeed, it appears the hearing lasted no more than a few minutes. The order terminating the guardianship itself contains no factual findings regarding the best interests of the minors.

Although the trial court received various declarations, along with belated recommendations from minor's counsel and the mediator, it still lacked information, such as the home study, or the guardian's response to the belated reports. Such additional information is important given the parents' documented history of drug abuse and Jennifer's recent drug relapse as well as their domestic violence issues and the minors'

14

well established and flourishing living arrangements with Shannon and their siblings in California. (*Guardianship of L.V., supra,* 136 Cal.App.4th at p. 496 [" '[A] parent's future potential is undoubtedly revealed in the parent's past behavior with the child. [Citation.] Thus, prior conduct is relevant in determining the best interests of the child.' "]; *Guardianship of Simpson, supra,* 67 Cal.App.4th at p. 938 ["Domestic violence is always a serious concern, and any propensity to it is certainly highly relevant as regards children's welfare."]; *In re Guardianship of Ann S*. (2009) 45 Cal.4th 1110, 1136 ["[a]fter years of guardianship, the child has a fully developed interest in a stable, continuing, and permanent placement with a fully committed caregiver."]; Prob. Code, § 1610 ["The Legislature finds and declares that it is in the best interests of children to be raised in a permanent, safe, stable, and loving environment."].)

This ruling without an evidentiary hearing is especially troubling in light of the fact that, prior to the hearing, the court had before it in the court file documents both in support of and in opposition to an order terminating the guardianship. As to the latter, significantly, was the probate investigator's report in which the investigator concluded that he did not support termination.

That the guardian's counsel persuaded the court to recall the matter does not mean the necessary evidentiary hearing occurred. The record shows the guardian was not given an adequate opportunity to present, and did not present any evidence or witness testimony for the court to consider. Indeed, the court apparently challenged counsel for the guardian to tell the court something that might persuade the court to change the order it had announced a few moments earlier. Thus, rather than placing the burden on the parents to show termination was in the minors' best interest as required by relevant authority (*Guardianship of Simpson, supra,* 67 Cal.App.4th at p. 933 [parent petitioning to terminate probate guardianship bears burden of proving termination warranted]), the trial court required the guardian's counsel to attempt to persuade him to change his order. The proceeding that occurred below simply does not comport with the requirement for a

15

"hearing" as one "where evidence is taken to the end of determining an issue of fact and a decision made on the basis of that evidence." (*Pennington, supra,* 66 Cal.2d at p. 521; *Ivendetti, supra,* 276 Cal.App.2d at p. 179.) Nor does it appear that the court approached the court appearance with an open mind prepared to listen and weigh the evidence and arguments of the parties on each side of the issue.

The court abused its discretion when it granted the petition and terminated the guardianship without providing the guardian a fair opportunity to oppose the late-filed reports or to present evidence on the issue of whether terminating the guardianship and returning custody of the minors to their parents was in their best interest.

Given the basis for reversal, we do not reach the guardian's other contentions. We leave it to the trial court to decide in the first instance whether the rebuttable presumption found in Family Code section 3041, subdivision (d) applies to a guardianship termination proceeding under Probate Code section 1601.

Because the issue of what is in the best interest of the minors is a factual inquiry that depends on current circumstances and because those circumstances are unknown to us and the trial court, the parties are not limited to the evidence in this record upon remand. (*Vaughan, supra,* 207 Cal.App.4th at p. 1073.) In the interest of justice, we order further proceedings in this matter be heard before a trial judge other than the judge whose judgment we have here reviewed. (*Id.* at p. 1074; Code Civ. Proc., § 170.1, subd. (c).) We also order custody of the minors remain with the parents pending the evidentiary hearing unless the trial court orders otherwise. (*Vaughan, supra,* 207 Cal.App.4th at p. 1074.)

DISPOSITION

The June 6, 2013, order terminating the guardianship of the minors is reversed and the case is remanded to a trial judge other than the judge whose judgment we have here reviewed. On remand, the trial court shall conduct an evidentiary hearing on whether

terminating the guardianship is in the minors' best interests.  The guardian is awarded her costs on appeal.   (Cal. Rules of Court, rule 8.278(a)(4).)


                                                              _____HULL_____, J.


We concur:


_____NICHOLSON_____, Acting P. J.


_____MAURO_____, J.