Filed 11/19/21  Guardianship of Z.K. CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| Guardianship of Z.K., a Minor. | |
| B.K.,<br><br>    Petitioner and Appellant,<br><br>        v.<br><br>K.K. et al.,<br><br>    Objectors and Respondents. | F082150<br><br>(Super. Ct. No. 3515)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Mariposa County.  Roger T. Picquet, Judge.  (Retired Judge of the San Luis Obispo Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Dunton Family Law and Kasey M. Dunton for Petitioner and Appellant.

No appearance for Objectors and Respondents.

No appearance for Minor.

-ooOoo-

This appeal is from the trial court's order terminating a temporary probate guardianship that had been established for the safety and welfare of a baby girl, Z.K.  The termination of the guardianship was granted by the trial court in response to a petition for such relief made by Z.K.'s biological parents, J.V. (Father) and K.K. (Mother) (together

**SEE CONCURRING AND DISSENTING OPINION**

Z.K.'s parents or the parents). The result of the order was that Z.K.'s custody was resumed by her parents even though one parent, Father, had been convicted of child molestation and was required to be registered as a sex offender under Penal Code section 290. After the trial court's order was issued, the person serving as temporary guardian, B.K., who is also Z.K.'s maternal grandfather (Grandfather or guardian), filed the instant appeal.

The main contention of error asserted by Grandfather is that the trial court did not adequately apply the legal mandate of Family Code section 3030, subdivision (a)(1),[1] which declares in part as follows: "No person shall be granted physical or legal custody of, or unsupervised visitation with, a child if the person is required to be registered as a sex offender under Section 290 of the Penal Code where the victim was a minor … *unless the court finds that there is no significant risk to the child* and states its reasons in writing or on the record." (Italics added.) In its order, the trial court found that assuming section 3030 is applicable to probate guardianships, there was no significant risk to Z.K. in this case if the parents were to obtain custody. In his appeal, Grandfather claims the record is insufficient as a matter of law to rationally support an inference of no significant risk to Z.K. Based on that contention, he asserts the trial court abused its discretion.[2]

As explained more fully below, we agree with Grandfather that the trial court abused its discretion. We reach that conclusion because there was no substantial evidence in the record to support a finding of "no significant risk" to Z.K. under section 3030. Accordingly, the order of the trial court is reversed, and Grandfather's temporary guardianship is reinstated forthwith. On remand, we also provide guidance to

---

[1]     Undesignated statutory references are to the Family Code.

[2]     We note that neither minor's counsel in the proceedings below, nor Z.K.'s parents, have filed a respondent's brief herein. We shall proceed to consider the appeal based on Grandfather's appellant's opening brief under the record provided to us. (Cal. Rules of Court, rule 8.220(a)(2).)

the trial court for the anticipated proceedings on permanent guardianship in this unique case.

**FACTS AND PROCEDURAL HISTORY**

The Temporary Guardianship Established

In April 2020, shortly after Z.K.'s birth, Z.K. was placed by the trial court in a temporary guardianship in which Grandfather was appointed as the temporary guardian. Z.K. was removed from the custody of her parents and placed into Grandfather's custody six days after her birth. In having temporary custody and taking care of Z.K. during said guardianship, Grandfather was helped in such responsibilities by his significant other, Christine Collins, who lived with Grandfather. During the guardianship, Mother was provided opportunities for visitation with Z.K.

According to Grandfather, he petitioned to establish the temporary guardianship because he feared for Z.K.'s safety, mainly because of Father's past criminal record and Mother's instability. As to Father's criminal history, Grandfather testified that shortly after he drove Mother to a prenatal visit in early April 2020, he did an internet search on Father and discovered "the appeals case" that described the basis for the molestation conviction against Father, "[a]nd it was extremely disturbing."[3] Although Grandfather had been out of contact with Mother for the previous eight years, he believed that she had mental health issues and a substance abuse problem. He noted that Mother tested positive for marijuana use at the time Z.K. was born. In filing his petition to establish temporary guardianship, Grandfather presented pleadings or declarations in support of his request. A supporting declaration was also submitted by Rachelle W. (Grandmother), who is Z.K.'s maternal grandmother (or Mother's mother). The record does not include

---

[3]     The appellate case referred to is *People v. Van Winkle* (1999) 75 Cal.App.4th 133, wherein the conviction of Father is described. In that appellate decision, we affirmed Father's conviction on two counts of lewd and lascivious conduct with a child (Pen. Code, § 288, subd. (a)), perpetrated in 1997 (the victim was his stepdaughter), and we approved the prosecution's use of evidence that he committed prior similar offenses with other young girls.

that declaration, but Grandmother testified regarding its contents, including assertions that in the past, Mother has been depressed, homeless, and has a history of alcohol abuse. Grandmother's declaration also stated her belief that Father had physically abused Mother.

Trial on the Petition to Terminate Temporary Guardianship

Two weeks after the temporary guardianship was put in place, Z.K.'s parents, through their legal counsel, filed a petition to terminate the guardianship. A court trial was held on that matter from October 21 to October 23, 2020. At the commencement of the trial, Grandfather clarified that he had not yet formally requested a permanent guardianship but intended to eventually do so. Thus, the petition to terminate the temporary guardianship was the sole matter being tried by the court. Z.K. was represented in the proceedings by minor's counsel; the parents were represented together by legal counsel; and the temporary guardian/Grandfather, represented himself. Although not part of the record on appeal, prior to the start of trial, investigative reports were received from both the court guardianship investigator and the county's Child Welfare Services (CWS). The trial court informed the parties that since there is an existing temporary guardianship, the burden was on the parents to demonstrate why it should be terminated.

Opening statements were presented. The attorney for the parents argued that the incidents reported by Grandfather as the basis for guardianship are solely events that are long past. In Grandfather's opening statement, he first explained that he can provide a safe and secure home for Z.K. to thrive. On the issue of why the guardianship should remain in place, he stated that Father has never acknowledged the prior convictions or the victims. Grandfather reiterated that he fears for Z.K.'s safety if she were to be left in the care of Mother and Father.

There was a conflict in the evidence at trial on a number of issues relating to the parents' general fitness to have custody of Z.K. Grandmother supported the continuation

4.

of the guardianship, stating Mother had previously been severely depressed, homeless, and had a history of alcohol abuse. Grandmother also stated her belief that Father had kicked Mother out of their house, even during the pregnancy, and she thought that in the past Father had physically abused Mother based on photographs from years before. In further testimony, Grandmother gave an account of a phone call she received in 2017 from a stranger indicating that Mother was outside a grocery store, alone and tearful, with marks on her face. Grandmother also testified that, in 2020, she spent several hours at the hospital with Mother when Z.K. was born, at which time Mother shared her belief that the charges for which Father was imprisoned were "all bogus," and that the other children who had testified against him "were bribed with toys to say the things they said." Although Grandmother had had very little contact with Mother over the past seven years, she reiterated her concern that she was unfit to be a parent due to past lifestyle choices and high-risk behaviors such as "homelessness, living out on the streets, hitchhiking, and online prostitution [stripping online for money]."

Grandfather took the stand and testified of his concern for Z.K.'s safety if she were returned to her parents based on Father's criminal history—i.e., the molestation conviction. Grandfather also believed that Mother was unable to handle raising a child because of her "unstable mental health condition." Additionally, he did not believe there was any stable source of income for Mother or Father.

Timothy Zavala, a licensed clinical social worker with expertise in the field of sexual abuse treatment, provided testimony regarding the level of risk that Father might pose to Z.K. He personally interviewed Father for several hours, discussed Father's prior convictions and sexual history, and conducted recognized diagnostic tests (including the "Static-99R" and the "Bumby Cognition scale") that are used to help predict the risk of recidivism of sexual offenders. Based on these considerations, Zavala's opinion was that Father was a low risk and was unlikely to molest anyone. Zavala stated that the substantial passage of time since Father was released from prison without a new offense

(over 15 years) was a factor in his conclusion that Father was not likely to reoffend. On cross-examination, Zavala admitted he was under the impression there had been only one victim, and he was not aware of there being other victims that testified at the trial in 1998.[4] He was then asked, "In this case, there were two additional victims testifying at the original [1998] trial. Would that change the evaluation?" Zavala answered, "Yes." At the same time, Zavala noted, "the Static-99R does not specifically address the number of victims. It addresses the number of convictions." Zavala's written report was also admitted into evidence. The report's conclusion stated: "Based on the results of the Static-99R and [Father's] recent 15-year history of no further allegations, charges or convictions for criminal behavior, it is extremely unlikely that he would pose a risk of harm to any child, much less his own."

Father also testified at the trial of the petition to terminate the guardianship. He admitted that in 1996 or 1997, he was convicted of violating Penal Code section 288. As a result, he went to prison for approximately eight years.[5] During his time in prison, he took numerous courses to "improve [his] situation." Many of the courses were to learn a trade; others were in helping overcome substance and drug abuse. The latter were "bible-based" courses. It did not appear from his testimony that he had taken any classes

---

[4] In referring to Father's criminal trial and conviction, the parties and witnesses sometimes referred to the date thereof as 1997, and at other times 1998.

[5] What is perhaps most remarkable about Father's testimony at the trial is what was *not* stated. He did not admit to any wrongdoing nor indicate any remorse; no victims were mentioned; he simply acknowledged the bare fact of his conviction. He referred to such matters as trade classes in prison, but he gave no indication of obtaining any counseling or therapy to remedy his past behavioral problems, nor did he offer any other reason the court should expect that what he did before will never happen again. On the other hand, if he believed he was innocent of wrongdoing, no explanation was given to the trial court to allow it to assess whether his denial of wrongdoing was credible. Unless Father's attitude about his past conduct and the existence of any remedial steps taken by him were covered in a confidential report to the trial court of which we have not been made aware, these would seem to be glaring omissions from the evidence. (See, e.g., *Guardianship of Simpson* (1988) 67 Cal.App.4th 914, 925–928 [evidence of the underlying potential murder of the minor children's mother by the father had to be considered in guardianship termination proceeding].)

relating to sexual abuse or education. At least one of the classes was a parenting class. During his time in prison, he also received a certificate stating he is an "ordained minister." He received it through the internet by paying a fee. The prison guards and warden allowed him to perform baptisms in prison. Father further testified that in 2005, soon after he was released from prison, he applied to have two of his minor sons (that he had with other women besides Mother) returned to him, and CWS conducted an investigation and granted his request. Father denied ever having committed domestic violence against Mother. He said he has never kicked her out of their home. He admitted that he and Mother have medical marijuana cards and sometimes smoke marijuana. He admitted that he is still on probation for failing to register as a sex offender in 2015. He admitted an arrest in 2011, saying that a lady tried to extort him by claiming he raped her. There was no conviction. Finally, Father testified that if the guardianship is terminated and Z.K. is returned, "[w]e have a bright future for her, to take care of her, provide her everything she needs. We live not even two miles from the school. We live across the street from the church." He and Mother had taken steps to prepare by buying "everything from clothes … to diapers to cribs to [a] car seat."

Mother also testified. She disagreed with the assertion that she had ever been homeless, explaining that she would from time to time visit a friend who needed help and she would always have a safe place to stay. She admitted to having a drinking problem in the past and being arrested more than once for public intoxication, but there had been no such arrests in the past eight years. She denied ever being suicidal. She denied that Father ever hit her or kicked her out of the house. She and Father sometimes had loud arguments, and occasionally the police were called by neighbors, but no physical violence ever occurred. She noted Father has a stable income, since he receives disability payments and sometimes works in a recycling center or occasional construction jobs. Father also owns his own home. In her opinion, Father was not guilty of the charges of which he was convicted. She was apparently referring to the conviction for child

7.

molestation, but her reference to that conviction was somewhat vague. Her belief in his innocence was based on "what he explained to me, what his father and mother explained to me, his other baby mommas explained to me, and all of the other files, and files and files and files I read on the trial."

Closing Arguments

After the close of the evidentiary portion of the trial, the parties had an opportunity to make closing arguments. The attorney for Z.K.'s parents argued that most of the evidence in the case related to "past history" and was not based on any more recent information. He also emphasized Zavala's report and testimony indicating Father was a below average risk of reoffending, a conclusion that was reinforced by the fact it had been more than 15 years since Father's release from prison with no further convictions of sexual offenses. Finally, he noted that section 3030 expressly allows the trial court to make a finding that there would be no significant risk to the child if custody were granted to a Penal Code section 290 registrant. On behalf of Z.K.'s parents, he urged the trial court to make such a finding and to terminate the temporary guardianship.

Grandfather's closing argument urged the trial court to focus on Z.K.'s safety and security. Grandfather argued the trial court should not grant custody to Z.K.'s parents because "[o]ne of the two is a convicted child molester" and "[h]is victims include a step-daughter, his own daughter, and his own niece." At that point, an objection was made by the parents' attorney that Grandfather was "misstating facts that were not presented in evidence." When the trial court sought clarification, Grandfather stated that while the charge and conviction was only as to one victim, in that trial "two other victims—[Father's] daughter and his niece—both testified." Minor's counsel then informed the trial court that details of the victims who testified at the criminal trial were contained in the investigative report (referring to the report written by Kristy Fujii, the court-appointed investigator) received into evidence by the trial court. After the above exchange, the trial court overruled the objection. Grandfather proceeded with his closing argument, pointing

8.

out there had been no mention of any of the victims in these proceedings, and that Mother and Father deny the truth of the conviction. Grandfather further argued: "[I]n all of these records, there's no mention at all of [Father's] daughter or niece or where they are today. To me, there's an unacceptable level of risk, if considering [Father] and/or [Mother] getting custody of [Z.K.]." As to the expert testimony by Zavala, Grandfather pointed out that Zavala only considered one victim when he prepared his Static-99R report and admitted that the existence of additional victims would alter his evaluation. Grandfather therefore urged the court to "continue the temporary guardianship until a permanent guardianship could be filed and completed."

Minor's counsel also made a closing argument. Minor's counsel asked the trial court to not only address section 3030, but also consider section 3044, the latter dealing with instances of domestic violence. Minor's counsel referred, as other parties did, to "Dr. Neufeld's report," a document not in the appellate record. Minor's counsel noted in his closing argument that neither Father nor Mother have shown they have done anything to address their past behaviors or issues. He added it was clear that the expert opinion on risk to the child was based on incomplete information. He concluded that the child would be in danger in the custody of Father and Mother and implored the court not to terminate the guardianship.

Parents' counsel had an opportunity for a final rebuttal argument. He noted, based on Fujii's investigative report, that although other victims may have testified at the criminal trial, Father "was never charged with any other victims but the one."

Trial Court's Order

On October 23, 2020, the trial court issued its written order to terminate the temporary guardianship. The court stated the primary issue before it was the impact of Father's sex offender conviction. Specifically, Father was "convicted of two counts of Penal Code section 288[, subdivision ](a) in 1997." The trial court further noted: "He committed no new offenses of any nature until 2015 when he was convicted of a failure

9.

to register in accordance with [Penal Code] section 290. For that offense he was placed on probation for five years with no jail or prison time. He is considered a low level probationer."

As to several issues relating to the general fitness of the parents, the trial court appeared to credit their testimony over that of the other witnesses. The trial court explained: "Both parents deny the allegations of [Grandfather] regarding alcohol and drug use with the exception of marijuana. They have indicated a willingness to either cease the use of tobacco and marijuana or to take steps to ensure that [Z.K.] would not be exposed to such substances. They contend that [Grandfather] simply doesn't like their lifestyle, or them. [Mother] denies any incidents of domestic violence or homelessness. Both parents contend they have sufficient income to provide for [Z.K.'s] needs, now and in the future." The trial court found that since his release from prison, Father "has been employed as a recycler and occasional[ly] work[s] in construction type activities," and he also receives disability income. Additionally, the trial court found it noteworthy that, in 2005, Father sought through CWS to be able to reunify with two of his other minor children (sons), and he was permitted to do so.

Therefore, in the trial court's assessment, the crucial issue was Father's conviction for violating Penal Code section 288, subdivision (a) in 1997. The trial court acknowledged that section 3030 precludes an award of custody or visitation to a person who is required to register as a sex offender under Penal Code section 290 where the victim was a minor, unless the court finds there is not a significant risk to the child. The trial court initially expressed a conclusion that section 3030 does not apply to probate guardianships, but, *in the alternative*, determined that "assuming that section 3030 does apply, the Court finds that there is not a significant risk to [Z.K.] should she be returned to her parents."

The trial court then explicitly stated the reasons for its finding of no significant risk as follows: "A. Father's conviction was 23 years ago and with the exception of his

10.

failure to register in 2015 he has had no notable criminal history since then (the court notes he was arrested in 2011 but the arrest did not result in charges being filed by the District Attorney's office).… [¶] B. In addition, the court investigator's and the CWS report[s] indicate the parents['] residence and income (minimal as it may be) is sufficient to provide for [Z.K.]'s needs in an acceptable manner. Further, this Court is unable to conclude that there is a risk of domestic violence based on the evidence that was presented at trial. Both parents indicated that they have arguments and disagreements that can be loud and may have resulted in a law enforcement response at least once but that, in and of itself, does not constitute a 'significant risk.' [¶] C. The allegations of drug use were not substantially supported by the evidence. Testing positive for THC (the active ingredient in marijuana) at birth is concerning but not to the degree that would warrant [Z.K.'s] removal from her parents."

Based on the above reasons as delineated by the trial court, the trial court found the "guardianship is not necessary nor is it in the best interest of [Z.K.]." In other words, the trial court found it was in the best interest of Z.K. to be returned to her parents' custody. Accordingly, the trial court's order held "[t]he [t]emporary [g]uardianship letters are hereby revoked and cancelled."

Grandfather's notice of appeal followed.[6]

**DISCUSSION**

**I. Overview of Probate Guardianship and Standard of Review**

The purpose of a probate guardianship is to protect the welfare of a minor child who ordinarily cannot protect himself or herself. (*Guardianship of A.L.* (2014)

---

**6** We quickly dispose of Grandfather's argument that the trial judge, the Honorable Roger T. Picquet, was somehow not a qualified member of the State Bar. No adequate showing was made to support this argument. A conclusory suggestion is made that the trial judge was on "inactive" status, but it appears that even if that were the case, one may be still considered a licensee in good standing. (See Bus. & Prof. Code, §§ 6003, 6006.) In short, Grandfather's attack on the trial judge's qualification to serve in the capacity as temporary judge is rejected as unsupported.

11.

228 Cal.App.4th 257, 267.)  Historically, probate guardianships have been established where conditions were shown to be such that, to allow the child to continue in its parents' custody would endanger the child's safety or welfare.  (*Ibid*.)[7]  Under Probate Code section 1514, a court may appoint a probate guardian if "it appears necessary or convenient" (Prob. Code, § 1514, subd. (a)), but the same section expressly provides that in making such an appointment the trial court is governed by Family Code section 3020 et seq., and section 3040 et seq., which are family law provisions relating to child custody and the best interest of the child.  (Prob. Code, § 1514, subd. (b); see *Guardianship of A.L.*, *supra*, 228 Cal.App.4th at p. 267.)[8]  For example, section 3020, subdivision (a) provides "the health, safety, and welfare of children shall be the court's primary concern in determining the best interests of children when making any orders regarding the physical or legal custody or visitation of children."  Once a guardianship is established, parental rights are "suspended" for the duration of the probate guardianship. (*Guardianship of Ann S.*, *supra*, 45 Cal.4th at pp. 1123–1124.)

---

[7]    We note the Probate Code guardianship provisions exist alongside two other statutory schemes that also entail custody matters.  One is the Family Code, which ordinarily relates to disputes between or involving the parents of children and may allow for custody to a nonparent custodian.  (*Erika K. v. Brett D.* (2008) 161 Cal.App.4th 1259, 1268–1269.)  A close connection exists between these two parallel schemes with respect to issues of custody and guardianship, and the Probate Code has explicitly made certain Family Code custody provisions applicable to probate guardianship appointments.  (*Ibid*.)  Another but very different statutory scheme is the dependency law carried out by the juvenile courts.  (See Welf. & Inst. Code, § 300 et seq.)  After the passage of juvenile dependency statutes, probate guardianships have continued to provide an alternative placement mechanism for children who cannot safely remain with their parents, but the differences between these two schemes are significant.  (*Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1122.)  Significant distinctions also exist between the family courts and the juvenile courts:  " '[D]ue to the separate and distinct purposes of the juvenile and family courts, many Family Code provisions do not apply in dependency proceedings.' "  (*In re C.M.* (2019) 38 Cal.App.5th 101, 108.)  Indeed, some Family Code provisions are expressly made not applicable to dependency proceedings.  (See, e.g., Welf. & Inst. Code, § 366.26, subd. (a).)

[8]    Probate Code section 1514, subdivision (b)(1) states:  "In appointing a guardian of the person, the court is governed by Chapter 1 (commencing with Section 3020) and Chapter 2 (commencing with Section 3040) of Part 2 of Division 8 of the Family Code, relating to custody of a minor."

In the present case, two weeks after the temporary guardianship was instituted, the parents sought to have it terminated. By the time of the court trial on the parents' petition, the guardianship had been in place approximately six months, with Grandfather serving as the temporary guardian during that period. The sole question before the trial court was whether to grant the petition made by the parents to terminate the temporary guardianship and restore custody of Z.K. to them. As noted, the trial court granted the parents' petition, and the instant appeal by Grandfather is taken from that order. We must therefore consider the law relating to termination of probate guardianships.

According to applicable statute, upon the petition of a parent, the guardian, or the minor ward, "the court may make an order terminating the guardianship if the court determines that it is in the ward's best interest" to do so. (Prob. Code, § 1601.) Thus, the best interest of the child is the standard which governs guardianship termination proceedings. (*Guardianship of A.L.*, *supra*, 228 Cal.App.4th at p. 268; *Guardianship of L.V.* (2006) 136 Cal.App.4th 481, 490.) "What constitutes the best interest of a child presents an inherently factual issue" and "is 'an inquiry that is particularly founded on application of the trial court's experience with human conduct.' " (*Guardianship of A.L.*, at p. 268.) Where parents seeking to regain custody of their minor child have petitioned to terminate an established guardianship, determining the best interest of the child will generally involve the trial court's consideration of the parents' fitness and also of whether the child has for a substantial period of time been living in the guardian's care in a safe, loving and stable environment. (See *Guardianship of L.V.*, at pp. 488–491; see also Fam. Code, § 3041, subs. (b), (c), (d); *Guardianship of Simpson*, *supra*, 67 Cal.App.4th at pp. 932–933; *Guardianship of A.L.*, at pp. 268–270.)[9] In the final analysis, however, the

___

[9] Here, the parents sought to set aside the temporary guardianship almost immediately after it was established, with the court trial on their petition taking place only six months after Z.K.'s birth. Although the trial court noted that a close bond had developed between Z.K. and Grandfather during that six months, and while the court advised the transition should not be done in an abrupt manner, the court's order did not indicate that the period of time of Z.K.'s temporary

13.

"sole criterion" for whether to terminate a probate guardianship is the best interest of the child. (*Guardianship of L.V.*, at p. 491; see Prob. Code, § 1601; *Guardianship of Ann S.*, *supra*, 45 Cal.4th at p. 1124.)

"The decision whether to terminate a guardianship is committed to the sound discretion of the trial court." (*Guardianship of L.V.*, *supra*, 136 Cal.App.4th at p. 488.) We review the trial court's factual findings for substantial evidence. (*Id*. at p. 487.) Evidence in the record is reviewed on appeal in the light most favorable to the trial court's decision, resolving all conflicts in the evidence and drawing all reasonable inferences in support of that court's findings. (*Ibid*.) "[I]issues of fact and credibility are the province of the trial court." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.)

Because a decision whether to terminate a guardianship involves weighing factual matters to evaluate what is best for the minor child, the trial court's determination is subject to *deferential* review on appeal. (*Guardianship of L.V.*, *supra*, 136 Cal.App.4th at p. 488.) We look only for clear error or abuse of discretion. (See *A.H. v. Superior Court* (2013) 219 Cal.App.4th 1379, 1392.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)

At the same time, we recognize that the discretion of a trial judge must be exercised within the confines of the legal principles governing the subject of its action. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.) "An order that implicitly or explicitly rests on an erroneous reading of the law necessarily is an abuse of discretion." (*Williams v. Superior Court* (2017) 3 Cal.5th 531,

---

guardianship with Grandfather was so substantial as to be material to the court's determination. Nor is that issue raised on appeal.

540.)  If the correct legal standard was not applied, the matter may be returned to the trial court for a new hearing to apply that standard.  (See *Guardianship of Vaughan* (2012) 207 Cal.App.4th 1055, 1059–1060, 1073–1074 [where trial court misunderstood or misapplied a statutory provision in proceedings relating to custody, the matter was reversed and remanded to apply correct standard].)

To the extent the present appeal requires the construction or interpretation of statute, we review such a legal issue de novo.  (*Guardianship of Vaughan*, *supra*, 207 Cal.App.4th at p. 1067.)

## II.  Applicability of Section 3030

In reviewing whether the trial court abused its discretion, it is first necessary to clarify whether section 3030 is applicable in the context of probate guardianships.  Doing so is necessary because we cannot ascertain whether the trial court abused its discretion or acted arbitrarily in this case "without considering the legal principles and policies that should have guided the court's actions."  (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)  As explained below, we conclude that section 3030 is applicable to probate guardianship proceedings when the custody of minor children is being decided.

Section 3030, subdivision (a)(1) states in relevant part:  "No person shall be granted physical or legal custody of, or unsupervised visitation with, a child if the person is required to be registered as a sex offender under Section 290 of the Penal Code where the victim was a minor, … *unless the court finds that there is no significant risk to the child and states its reasons in writing or on the record*.  The child may not be placed in a home in which that person resides, nor permitted to have unsupervised visitation with that person, unless the court states the reasons for its findings in writing or on the record."  (*Ibid*., italics added.)

Here, the trial court ultimately made findings under section 3030, doing so in the alternative after initially stating its opinion that section 3030 does not apply to probate guardianships.  The trial court was correct to address section 3030 because, as explained

15.

below, we conclude that said provision *is* applicable to probate guardianships involving the custody of minor children, as was the case here.

As already pointed out herein, Probate Code section 1514, subdivision (b)(1) expressly applies certain Family Code child custody provisions to probate guardianship proceedings. The Family Code provisions referenced by this Probate Code section are the following: "Chapter 1 (commencing with Section 3020) and Chapter 2 (commencing with Section 3040) of Part 2 of Division 8 of the Family Code, relating to custody of a minor." (Prob. Code, § 1514, subd. (b)(1).) Since section 3030 is within chapter 1, part 2, division 8 of the Family Code, it is clearly one of the Family Code custody provisions identified by Probate Code section 1514, subdivision (b)(1) to govern in probate guardianship proceedings that relate to the custody of minor children.

The fact that the present case involves a petition to *terminate* a guardianship, which is distinct from and comes after the initial appointment, does not change our conclusion. The descriptive opening phrase of subdivision (b)(1) of Probate Code section 1514, which states, "in appointing a guardian of the person," appears to be distinguishing a guardianship *of the estate* mentioned in subdivision (a), not limiting the application of the Family Code statutes to the initial appointment. Moreover, in the context of a petition to terminate a guardianship in which the custody of a minor child is being decided, issues such as the potential *continuation* of the initial guardianship appointment *and* the prospect of granting or resuming parental custody would necessarily be at stake, and therefore the same fundamental child custody considerations would be involved there as in the initial appointment. Since the same important issues and purposes would be at stake, it is reasonable to assume the Legislature intended the scope of Probate Code section 1514, subdivision (b)(1) to be interpreted broadly to include guardianship termination proceedings.

This conclusion would appear to be further supported by Probate Code section 1601, which adopts the *best interest of the child* standard (a family law concept)

16.

for determining whether to terminate a probate guardianship. If, pursuant to Probate Code section 1514, subdivision (b)(1), a court may only appoint a guardian if it is in the child's best interest *as determined under the specified Family Code custody statutes* (see *Guardianship of A.L.*, *supra*, 228 Cal.Ap.4th at p. 267), the usage of the same best interest of the child standard in Probate Code section 1601 would appear to require a consideration of the same Family Code statutes when deciding a petition to terminate a guardianship.

In construing a statutory provision, we do so in context, keeping in mind the nature and obvious purpose of the statute as well as that of the statutory framework as a whole. (*Guardianship of A.L.*, *supra*, 228 Cal.App.4th at p. 266.) In *Guardianship of A.L.*, the appellate court construed Probate Code section 1601 to require an evidentiary hearing before a court may terminate a probate guardianship, "[g]iven section 1601's context, the underlying purpose of the probate guardianship statutes, the magnitude of the interests at stake, and the fundamental factual issue involved—a child's best interest, including his or her health, safety, and welfare." (*Id.* at p. 269.) The appellate court in *Guardianship of A.L.* also emphasized "that a trial court's decision terminating a probate guardianship ultimately involves the custody of a minor," and recognized that Probate Code section 1601 comes within a larger statutory framework that includes Family Law custody provisions and should be read in that light. (*Id.* at pp. 268–269.) For similar reasons as we have summarized above, we conclude that Probate Code section 1514, subdivision (b)(1)'s adoption of certain Family Law custody provisions applies not only to an initial guardianship appointment, but also to a trial court's consideration of a petition to terminate a guardianship under Probate Code section 1601.

Finally, we agree with the gist of Grandfather's argument based on the clear and emphatic language of section 3030 itself, including the following statement in subdivision (a)(1): "No person shall be granted physical or legal custody of, or unsupervised visitation with, a child if the person is required to be registered as a sex

17.

offender under Section 290 of the Penal Code where the victim was a minor … unless the court finds that there is no significant risk to the child and states its reasons in writing or on the record." In determining a statute's intent, we look first to the language of the statue, giving effect to its plain meaning. (*Guardianship of Vaughan*, *supra*, 207 Cal.App.4th at p. 1071.) Since section 3030 states a clear and broadly-worded mandate that is obviously intended to protect minor children from sexual offenders, and since nothing in the statutory wording thereof would tend to limit its application, there is no reason we know of that it should not apply or extend to probate guardianships, which is recognized to be a closely parallel system to the Family Code on such matters. (See *Erika K. v. Brett D.*, *supra*, 161 Cal.App.4th at pp. 1268–1269; see also *Lara v. Board of Supervisors* (1976) 59 Cal.App.3d 399, 408 [noting a general principle of statutory construction that, unless statutory wording or context otherwise indicates, "codes are to be read together and blended into each other as though there was but a single statute"].)

For all of the above reasons, we hold that section 3030 was applicable in the context of the petition to terminate guardianship heard by the trial court in this case.

## III.  The Trial Court Abused its Discretion Because its Finding under Section 3030 Was Not Supported by Substantial Evidence in the Record

It is not disputed that Father was convicted in approximately 1998 of violating Penal Code section 288, subdivision (a) and is therefore required to register as a sex offender under Penal Code section 290. As a result, section 3030 applied and had to be followed by the trial court before allowing the custody of Z.K. to be undertaken by Father or before allowing Z.K. to live in a home in which Father resides. Specifically, the trial court was required to find that "there is no significant risk" to Z.K., and to state its reasons for so finding in writing or on the record. (Fam. Code, § 3030, subd. (a)(1).)

The trial court did make a formal finding of no significant risk and expressed a reason for the same. The trial court's order stated: "[T]he Court finds that there is not a significant risk to [Z.K.] should she be returned to her parents." The dispositive rationale

18.

and factual basis for that finding was the long passage of time without a new offense: "Father's conviction was 23 years ago and with the exception of his failure to register in 2015 he has had no notable criminal history since then .…" No other factual basis was apparent in the record or alluded to by the trial court on the precise issue of whether there would be no significant risk to Z.K. in view of Father's prior conviction under Penal Code section 288. The trial court did refer to other topics, such as the fact that investigative reports showed the parents' residence and income were adequate to provide for Z.K. in those respects. The trial court also indicated it did not credit the accusations of domestic violence or of Mother's purported drug or alcohol abuse. But as far as the section 3030 issue was concerned, the trial court's order relied solely on the passage of time.

On appeal, Grandfather contends the facts and circumstances before the trial court were insufficient, as a matter of law, to support a reasonable inference of there being no significant risk to Z.K. On the record before us, we agree with Grandfather's contention because the key finding of no significant risk was not supported by substantial evidence. In an appeal from an order on a petition to terminate a probate guardianship, we review the trial court's factual findings under the substantial evidence test. (*Guardianship of L.V.*, *supra*, 136 Cal.App.4th at p. 487.)

Although a trial court's termination of a guardianship is an exercise of its discretion reviewable for abuse of that discretion, we note that the abuse of discretion standard of review *includes an evidentiary component*; that is, if there was no substantial evidence to support a necessary finding upon which the exercise of discretion was based, then the court's discretion was abused. (*Bechtel Corp. v. Industrial Indem. Co.* (1978) 86 Cal.App.3d 45, 48; *Stack v. Stack* (1961) 189 Cal.App.2d 357, 368; accord, *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1065 [sufficiency of evidence to support a discretionary ruling includes a review for substantial evidence].) " '[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the

19.

evidence for the ruling.' " (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) Of course, the standard remains deferential: a reviewing court will interfere only if it finds that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he or she did. (*Ibid.*) As explained more fully below, even under that deferential standard, we conclude that the trial court had no evidentiary basis in the record upon which to reasonably infer that there was no substantial risk to Z.K.—and therefore, the trial court abused its discretion.

At the court trial below, Timothy Zavala, a licensed clinical social worker, was the sole expert who testified on the issue of whether Father had a likelihood of committing further sexual offenses or might pose a significant risk to Z.K. He had personally interviewed Father for several hours, discussed Father's prior convictions and sexual history with him, and conducted diagnostic tests (including the "Static-99R" and the "Bumby Cognition scale") that are used to help predict the risk of recidivism of sexual offenders. Zavala stated that the substantial passage of time since Father was released from prison without a new offense (over 15 years) was also a factor in his conclusion that he was not likely to reoffend. Based on these considerations, Zavala's opinion was that Father was a low risk and was unlikely to molest anyone. However, on cross-examination, Zavala admitted that he had assumed there was only one victim; he had not been informed by Father that there were actually two other minor girls who had testified at the criminal trial to being victims of sexual molestation by Father.[10] The following question was then posed to Zavala: "In this case, there were two additional victims testifying at the original trial. Would that change the evaluation?" Zavala answered, "Yes."

_____

[10]     The other two victims testified at the criminal trial against Father, asserting how Father had repeatedly molested them sexually many years in the past, although no charges were brought against Father as to those other two victims. (See *People v. Van Winkle*, *supra*, 75 Cal.App.4th at pp. 137–138.)

Because Zavala had not previously been informed of, nor given the opportunity to fully evaluate and consider, the substantial evidence in the record for the existence of multiple victims, and because he based his opinion on the unsupported assumption that there was only one victim, we conclude that his expert opinion was of no evidentiary value. The following pertinent principles on the value of expert opinions are well established: "The value of opinion evidence rests not in the conclusion reached but in the factors considered and the reasoning employed. [Citations.] Where an expert bases his conclusion upon assumptions which are not supported by the record, … then his conclusion has no evidentiary value. [Citations.] In those circumstances the expert's opinion cannot rise to the dignity of substantial evidence." (*Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135.) "[E]xpert testimony does not constitute substantial evidence when based on conclusions or assumptions not supported by evidence in the record …." (*People ex rel. Brown v. Tri-Union Seafoods, LLC* (2009) 171 Cal.App.4th 1549, 1567.) " '[T]he expert's opinion is no better than the facts on which it is based.' " (*People v. Gardeley* (1996) 14 Cal.4th 605, 618.) "[A]n expert's assumption of facts contrary to the proof destroys the opinion." (*Hyatt v. Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 338.) " 'If his opinion is not based upon facts otherwise proved, or assumes facts contrary to the only proof, it cannot rise to the dignity of substantial evidence.' " (*Id.* at pp. 338–339.)

There was evidence in the record of multiple victims. The parties at the guardianship termination court trial referred to an investigative report admitted into evidence without objection that detailed the testimony of the other two victims who testified at the criminal trial.[11] The evidence of the existence of two other minor victims was directly relied on by Grandfather in his closing argument wherein he referred to

---

**11** Although that document did not become part of the appellate record, there was no dispute as to what it contained.

21.

Father's molestation victims as including "a step-daughter, his own daughter, and his own niece." The parents' attorney objected that Grandfather was stating facts not in evidence, but the trial court overruled the objection after being reminded of the contents of the investigative report. Therefore, the matter of the other victims was part of the factual record in the trial court for purposes of the petition to terminate guardianship. On the other hand, there was no evidence in the record to contradict the evidence of multiple victims or that proved there was only one victim.

Because Zavala assumed there was only one victim, and did not have an opportunity to consider the evidence of multiple victims because it was not disclosed to him by Father, Zavala's expert opinion was based on assumptions not supported by the record and did not rise to the level of substantial evidence.[12] To the extent the trial court implicitly relied on Zavala's opinion, the trial court's finding was not supported by substantial evidence.[13] Nor was there any other evidence in the record to support the trial court's conclusion that there would be no significant risk to Z.K. Since the critical foundational finding necessary to the trial court's decision—i.e., the finding of whether there was no significant risk to Z.K. if Father obtained custody—was not supported by substantial evidence in the record, we conclude the trial court abused its discretion. Therefore, the trial court's order terminating the temporary guardianship must be reversed.

---

[12]     Since this is so, any isolated reference in Zavala's testimony to the passage of time as a factor becomes merely speculative and conjectural, because it is unclear what Zavala's evaluation would be upon fully considering the evidence of multiple victims.

[13]     Although the question of the likely future behavior (i.e., the risk of reoffending) of a child molester under all the relevant facts and circumstances of a particular case would appear to be a matter concerning which the opinion of a qualified expert would be of considerable assistance to a trial court, we are not saying that an expert opinion is required under section 3030. *However*, in light of the lack of other evidence bearing on this question, this case ultimately depended on the validity of the expert's opinion. Further, as we observe in our discussion below concerning the dissent, the mere passage of time alone, absent any meaningful context, did not provide a supporting basis for the trial court's ruling that there was no significant risk to Z.K.

## IV. Remaining Evidence Incapable of Supporting Trial Court's Ruling

Having concluded that Zavala's opinion was of no evidentiary value on the question of whether there was no significant risk to Z.K. if Father were granted custody, we next briefly explain why the remaining evidence was incapable of supporting the trial court's ruling. As part of our discussion, we also respectfully note our differences of opinion with our dissenting colleague.

We begin with the matter of the passage of time. The dissenting opinion argues that, even apart from Zavala's opinion, the long passage of time by itself constituted substantial evidence to support the trial court's conclusion of no significant risk to Z.K. (Conc. & dis. opn. *post*, at pp. 3–4.) We disagree because there is nothing in the record from which to meaningfully evaluate the significance of that passage of time here. Although it was true that, at the time of the trial court's determination, approximately 23 years had elapsed since Father's molestation conviction, eight of those years were spent in prison, and we know little or nothing about the circumstances of the succeeding 15 years. It should be emphasized at this point that Father's conviction was for molesting a young girl, a family member, and there was some evidence in the record that Father may have molested two other young girls, also family members, before that. With that in mind, we observe that during the 15-year period after Father's release from prison, we do not know whether he had young girls or other young children residing with him. We also do not know whether he was under any parole or probation restrictions in terms of his living arrangements or access to young children. Thus, we do not know if Father had the opportunity to reoffend even if that were his penchant during those 15 years. Consequently, lacking any adequate factual context, we conclude the mere passage of time by itself was far too equivocal in this case to constitute substantial evidence of "no significant risk" to Z.K.

The dissenting opinion also argues that Zavala's diagnostic test, the Static-99R, supported Zavala's opinion and the trial court's determination. (Conc. & dis. opn. *post*,

at p. 4.) We disagree. Although that diagnostic test was one of the supporting factors of Zavala's opinion, the test's weight and value in rendering a final opinion would be a matter for Zavala to decide under all relevant circumstances. It would be speculation to attempt to guess what Zavala's final opinion would have been—even with the Static-99R—if the evidence of multiple victims had been timely brought to his attention.

The dissenting opinion notes further that, in 2005, CWS allowed Father to regain custody of two of his older boys (children from Father's relationships with other women besides Mother), ages 10 and 16. (Conc. & dis. opn. *post*, at p. 6.) Considering that Father was convicted of molesting a young girl, and may have molested two other young girls, we fail to discern how this 2005 decision by CWS relating to older boys would have any relevance to the ultimate question of whether a significant risk was posed to Z.K.

Finally, the dissenting opinion notes that the trial court apparently credited Father's testimony at the hearing below. (Conc. & dis. opn. *post*, at p. 5.) While that may be the case, we think the crediting of Father's testimony could only support the trial court's determination if the substance of that testimony tended to prove that Father is not a significant risk to Z.K. However, as we have pointed out, that was not the case. (See *ante*, fn. 5.) There was no remorse expressed, no explanation given, nor any other facts or circumstances testified to by Father that would tend to support a conclusion that he is not a risk to Z.K.

Of course, we fully agree with the principle relied on by our dissenting colleague that great deference must be accorded to a trial court regarding the custody of minor children. However, in this unique case, in the absence of any evidence that could potentially support the conclusion of "no significant risk" to the child, and where the expert acknowledged that his opinion would be changed if he had been informed of multiple victims, we hold the trial court abused its discretion. We simply cannot defer in the absence of substantial evidence to support the decision reached by the trial court—

particularly where, as here, that decision concerned the safety of a minor child. Accordingly, the decision of the trial court is reversed.

## V. Summary of Disposition

Some further remarks concerning our disposition are required. The trial court's order concerned Grandfather's *temporary* guardianship. We construe the trial court's order as terminating that temporary or provisional guardianship. For the reasons we have explained in this opinion, the trial court's order to terminate said guardianship constituted an abuse of discretion and is therefore reversed. Accordingly, Grandfather's temporary guardianship is hereby reinstated. On the record before us, the reinstatement of said temporary guardianship and of Grandfather's custody of Z.K. pursuant thereto is imperative in view of the clear mandate of section 3030.[14]

Although the Probate Code allows for the appointment of a temporary guardian, as here, that is ordinarily for a short duration until a more permanent situation (i.e., a non-temporary guardian) is decided upon. (See *Guardianship of C.E.* (2019) 31 Cal.App.5th 1038, 1048, fn. 6; Prob. Code, §§ 2250, subd. (b) [temporary guardian appointed "pending the final determination of the court" upon a guardianship petition], 2257 [temporary guardianships expiration]; see also Prob. Code, § 2251 [letters should indicate a termination date].) In the proceedings in the trial court, Grandfather stated he was ready and willing to be appointed permanent guardian, indicating that if the temporary guardianship was continued by the trial court, he would file to become Z.K.'s permanent guardian.

---

[14] We assume, as the trial court did in accordance with the parents' testimony, that Father and Mother continue to reside together in the same home. (See § 3030, subd. (a)(1) [the child may not be placed in a home in which that person resides unless conditions of statute satisfied].) Since they are in the same home, section 3030 obviously comes into play. If that situation were to change, Mother would be free to make a new petition under Probate Code section 1601 without the obstacle of Family Code section 3030.

On remand, in the event the trial court is presented with such a request by Grandfather or other qualified individual, the following comment will provide needed guidance as to one aspect of that process. In the event the parents object to permanent guardianship and seek to be awarded custody of Z.K., they are not foreclosed from presenting evidence at the hearing, including evidence which they believe would meet their burden of demonstrating that there is no significant risk to Z.K. pursuant to section 3030. We recognize this allows something like a rehearing once a permanent guardianship is requested, but in light of the unique procedural posture in which only a temporary guardianship was at issue before the trial court, and because of the importance of the issues at stake in this matter for all of the parties, we believe this instruction is appropriate and comports with due process. Of course, in exercising its discretion in connection with a request to appoint a permanent guardian, the trial court's decision is to be governed by the applicable family law statutes on the custody of children (see Prob. Code, §§ 1514, subd. (b)(1), 1601), with a particular focus on the best interest of Z.K.

## DISPOSITION

The order of the trial court to terminate Grandfather's temporary guardianship is reversed. Grandfather's temporary guardianship is reinstated forthwith. On remand, in the event a petition for permanent guardianship is presented as anticipated, the trial court shall proceed in a manner consistent with this opinion.

HILL, P. J.

I CONCUR:

POOCHIGIAN, J.

26.

**SMITH, J., Concurring and Dissenting.**

I concur with the majority's conclusion that Family Code section 3030[1] applies in the context of probate guardianships. However, I respectfully dissent from the majority's conclusion that the trial court's stated reasons for finding no significant risk to Z.K. if she were returned to Father, are insufficient as a matter of law. For the reasons discussed below, I would affirm the trial court's order terminating temporary guardianship.

Below, the burden of proving there is "no significant risk" rested with Father, the party seeking custody of Z.K. On appeal, Grandfather, the appellant, has the burden of showing the trial court abused its discretion. (*Boyle v. CertainTeed Corp.* (2006) 137 Cal.App.4th 645, 649-650.) Based upon the majority's reasoning, I am not persuaded this burden has been met.

I begin my analysis with emphasizing the deferential standard of review to which we are bound, which I believe is dispositive of this issue. We review the lower court's ruling for an abuse of discretion. (*Guardianship of L.V.* (2006) 136 Cal.App.4th 481, 488.) A court abuses its discretion only when " ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*In re Caden C.* (2021) 11 Cal.5th 614, 641, citing *In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) "But " " '[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " ' " (*In re Caden C*, *supra*, at p. 641, citing *In re Stephanie M.*, *supra*, at p. 319.) " 'The reviewing court should interfere only " 'if ... under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did.' " ' " (*In re Caden C*, *supra*, at p. 641, citing *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.)

---

[1] All undesignated statutory references are to the Family Code.

1

Here, the majority contends the trial court abused its discretion in finding there would be no significant risk to Z.K. because "the trial court had no evidentiary basis in the record upon which to reasonably infer that there was no substantial risk to Z.K." (Maj. opn. *ante*, at pp. 20-21.) I disagree.

We review the trial court's factual findings for substantial evidence. (*Guardianship of L.V.*, *supra*, 136 Cal.App.4th at p. 487.) Under this venerable standard, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence, contradicted or uncontradicted, which will support the trial court's decision. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.) "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 652.)

The trial court provided only two stated reasons in support of its finding of no significant risk to Z.K. if she were returned to Father. First, the fact that Father's conviction occurred 23 years ago. Second, with the exception of Father's failure to register in 2015, he has no notable criminal history since his prior conviction. While the trial court's statement of reasons leaves much to be desired, it is nonetheless sufficient for purposes of our review for substantial evidence. Our inquiry is whether there is substantial evidence, *upon the entire record*, to support the trial court's finding that Father does not pose a significant risk to Z.K. (*Bowers v. Bernards, supra,* 150 Cal.App.3d at pp. 873-874.)

To that end, here are the facts that support the trial court's finding: Father was convicted of two counts of lewd and lascivious conduct with a child (§ 288, subd. (a)) over 23 years ago. In the interim, he was permitted to reunify with his two other minor children by Child Welfare Services (CWS). This occurred relatively soon after Father was released from prison and at the conclusion of an investigation by CWS. Father has

2

suffered no significant criminal convictions since then, including in the 15 years since he has been out of custody. His Static-99R score indicates he poses a below average risk of reoffending. Thus, there is substantial evidence that Father does not pose a significant risk to Z.K.

In my view, the majority's conclusion to the contrary is flawed for three reasons. First, I am not persuaded by the majority's explanation as to why the trial court's finding that there is no significant risk to Z.K. is not supported by substantial evidence. Substantial evidence is reasonable, credible, and of solid value—such that a reasonable trier of fact could make the findings challenged. (*In re Brian M.* (2000) 82 Cal.App.4th 1398, 1401.) If the passage of time coupled with no new significant criminal convictions is insufficient to conclude that Father does not pose a significant risk to Z.K., that begs the question, why is this evidence not reasonable in nature, credible, and of solid value?

The majority reasons the record does not show whether Father had the opportunity to commit a new sex offense within the 15-year period following his release from custody. (Maj. opn. *ante*, at p. 23.) According to the majority, the passage of time alone is therefore far too equivocal to support the inference that Father does not pose a significant risk to Z.K.

I do not agree with the majority's suggestion that Father was required to conclusively prove a negative, i.e., that he did not recidivate because he lacked the opportunity to do so. To presume Father had no opportunity to recidivate as the majority suggests—either based upon an unarticulated penchant for a specific type of victim or based upon the conditions of his probation—neither of which are known from this record—is purely conjectural. (Maj. opn. *ante*, at p. 23.) For purposes of our review, all conflicts in the evidence and all reasonable inferences therefrom are drawn in support of the court's findings. (*Guardianship of L.V., supra,* 136 Cal.App.4th at p. 487.) I believe the trial court could reasonably conclude from the passage of time and Father's lack of

3

any subsequent convictions of significance, that he did not recidivate despite having had some opportunity to do so within the span of 15 years.

Second, although an expert's opinion was offered at the court trial below, the majority concludes the court could not rely upon Zavala's opinion because it was based upon the assumption that there was only one victim of Father's prior crimes. Upon this record, we do not know how Zavala's opinion was affected by the fact that there were multiple victims. When Zavala was asked whether the presence of two additional victims testifying at Father's criminal trial would have changed his evaluation, he responded affirmatively. However, he was never asked the penultimate question of *how* that would have changed his opinion.

Without knowing how this factor would have changed Zavala's professional opinion, I do not agree with the majority's conclusion that Zavala's opinion "was of no evidentiary value." (Maj. opn. *ante*, at p. 21.) I specifically disagree with the majority's finding that Zavala's testimony with respect to the passage of time was "speculative and conjectural" based upon the unknown influence of presence of multiple victims. (Maj. opn. *ante*, at p. 22, fn. 12.)

But, even excluding Zavala's ultimate opinion, he did offer testimony that supports the trial court's conclusion that Father is not likely to recidivate. Zavala testified there were two relevant assessments. First, there is the Static-99R, which indicated Father was a below-average risk. This report, which was received into evidence, is based upon criminal history and court documentation and is unaffected by anything the subject of the test may disclose or not disclose. Zavala testified the Static-99R's "accuracy at predicting reoffense is great."

Second, there was Zavala's professional opinion, which was based upon Zavala's interview with Father and Zavala's professional experience. Although Zavala's professional opinion would have changed based upon the existence of multiple victims,

4

the Static-99R test results would not have changed unless the victims were a different gender, which was not the case here.  Zavala testified that the Static-99R test is based upon the number of convictions, not the number of victims.  Thus, while Zavala stated he would take the number of victims into account, he explained that "according to the Static-99R, it doesn't count."

Assuming we must discount Zavala's professional opinion, I see no reason why we must also discount Father's Static-99R score, and Zavala's explanation of its significance.  Father's below-average risk score on the Static-99R has significant evidentiary value independent of Zavala's expert opinion, as Zavala explained.  However, the majority disregards Father's Static-99R score entirely, throwing the baby out with the proverbial bathwater.

Finally, the majority observes "glaring omissions" from Father's testimony, including his apparent lack of remorse for his prior crimes, his failure to indicate whether he has participated in therapy, and the fact that he offered no reassurances that he would not reoffend.  (Maj. opn. *ante*, at p. 6, fn. 5.)  This is not a case where Father's crimes were never considered at all.[2]  (See, e.g. *Guardianship of Simpson* (1998) 67 Cal.App.4th 914, 928, 934 [the trial judge stated that she did not consider evidence of the murder of the minor children's mother, although it was "the single most important issue bearing on the father's fitness to parent his children"].)  Indisputably, the single most important issue before the trial court was whether Father was likely to recidivate, and Father's testimony would likely have been significant to the trial court's determination.  Nothing upon this record demonstrates that the court failed to consider Father's testimony in determining whether he posed a significant risk to Z.K., including what Father did not say.

---

[2]    As the majority explained, details of the victims who testified at Father's criminal trial were contained in court-appointed investigator Fujii's report, which was received into evidence.

5

On the other hand, the majority ascribes no significance to what Father did say during his testimony. Father testified that he was permitted to regain custody of two of his minor children shortly after his release from prison. He explained this occurred after temporary visits were conducted by the county, the completion of parenting classes, taking a polygraph examination, and the administration of a "sexual evaluation." Although the majority places no weight upon the investigation conducted by the CWS, it does bear upon Father's risk of recidivism. (Maj. opn. *ante*, at p. 24.) The majority suggests Father has a penchant for young girls. (*Ibid.*) Assuming that is true, it is almost inconceivable that if Father posed a significant risk of recidivism, the CWS would have concluded it was in the best interests of Father's minor children to be returned to his home and potentially exposed to his deviant behavior.

Upon the evidence discussed above, I would conclude the trial court's finding that Father does not pose a significant risk to Z.K. is supported by substantial evidence. Finding substantial evidence to support the trial court's finding, and under the deferential standard to which we are bound, I would affirm.

SMITH, J.